**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| YAH DOUGLAS and<br>BRIDGET WILSON, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 19-cv-2272 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ALFASIGMA USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Yah Douglas and Bridget Wilson are suing their former employer, Alfasigma USA, for employment discrimination. Both Douglas and Wilson are black women, and they claim that Alfasigma discriminated against them on the basis of their race and sex.

The complaint alleges various forms of discrimination. Douglas and Wilson claim that they received less pay than their white male counterparts, and were passed over for promotions, even though they were equally (or more) educated, experienced, and productive. They allege that their colleagues ostracized them and made insensitive remarks, creating a hostile work environment. And they allege that when they complained to Human Resources, Alfasigma retaliated against them.

Douglas and Wilson bring claims under the FLSA (Counts I & II) and section 1981 (Counts III & IV). Wilson (but not Douglas) also brings claims under Title VII (Count V). Alfasigma moved to dismiss. For the reasons stated below, the motion to dismiss is granted in part and denied in part.

**Background**

Plaintiffs Yah Douglas and Bridget Wilson worked as sales representatives for Defendant Alfasigma until 2018.  *See* Second Am. Cplt., at ¶ 1 (Dckt. No. 73).  Alfasigma manufactures "medical foods," which the complaint describes as food products designed for persons with specialized nutritional needs.  *Id*. at ¶¶ 8–10.

Alfasigma assigns sales reps to teams based on geography.  *Id*. at ¶ 17.  Douglas and Wilson were members of Alfasigma's "Great Lakes West District" sales team, which covered "portions of Illinois and nearby states."  *Id*. at ¶¶ 17–18.  Douglas was on the Great Lakes West team from 2014 until she quit in 2018.  *Id*. at ¶¶ 11, 73. Wilson was on the team from 2015 until she was fired in November 2018.  *Id*. at ¶¶ 14, 148.

For most of that period, there was little turnover.  The team included the same thirteen core members:  one district manager and twelve "sales reps."  *Id*. at ¶¶ 27–28 (explaining that "[d]uring the relevant time period the members of the sales team fluctuated slightly, but for the most part consisted of [the same] twelve sales reps").  The district manager, Jamie Oliver, was white.  *Id*. at ¶ 28.  The dozen sales reps included seven white men, two white women, and three black women (including Douglas and Wilson).  *Id*. at ¶ 18.

**I.      Pay and Promotion Discrimination**

**A.      The Sales Rep Role**

All twelve sales reps had "the same job title" and the same responsibilities.  *Id*. at ¶¶ 19–20.  The district manager assigned each rep a geographic area, usually a set of contiguous zip codes.  *Id*. at ¶¶ 20, 32.  Each rep was responsible for "making face-to-face contact with health providers" in that area, "telling them the merits of various Alfasigma products" and "encouraging them to prescribe Alfasigma products for their patients."  *Id*.  The team did not

have a physical office, so the reps worked out of their homes or cars, and attended team meetings at a hotel about once every three months.  *Id*. at ¶¶ 21, 23–24.

### B.    Compensation

The sales reps received two forms of compensation:  a base salary (including merit increases), and cash prizes for performance.  *Id*. at ¶ 26.

First, sales reps received base pay.  The complaint does not reveal how Alfasigma determined the starting base pay for each sales rep.  Plaintiffs imply that it might have something to do with education and experience.  *Id.* at ¶ 31.

Sales reps received merit increases in their base pay, depending on their performance during the previous year.  *Id*. at ¶ 39.  The company had a "fixed formula" for assessing each rep's annual performance.  *Id*. at ¶ 40.  That formula used data about each employee's annual sales figures and "other performance parameters," and assigned each employee to one of three categories:  "achieved expectations," "exceed[ed] expectations," or "exceptional."  *Id*.  Sales reps who "achieved expectations" were entitled to merit increases of "1% to 2.99%."  *Id*. at ¶ 42.  Sales reps who "exceeded expectations" were entitled to merit increases of 2% to 4.99%.  *Id*.  Sales reps who were "exceptional" were entitled to merit increases of 4% to 6%.  *Id*.  It's not exactly clear from the complaint how the company decided how large of a merit increase to give each rep within that range.  Plaintiffs imply that Oliver (their district manager) may have been responsible for that decision.  *Id*. at ¶¶ 49–50, 54, 58–59, 61.

Second, sales reps could earn additional lump sum payments based on their performance.  *Id*. at ¶ 26.  Plaintiffs describe these lump sum payments as "a bonus, or commission, based on meeting or exceeding sales quotas, and valuable prizes for various outstanding items of work."  *Id*.  It's not clear from the complaint exactly how the company assessed employee performance

with respect to these awards, or who decided which employees got what awards. Once again, the complaint implies that Oliver made the decisions. *Id*. at ¶¶ 111–112.

### C. Comparing Members of the Sales Team: Education, Experience, and Performance

When the company hired Douglas and Wilson in 2014 and 2015, respectively, they had "far" more "education and years of experience" than the seven white males on the team. *Id*. at ¶ 30.

Douglas had the highest level of education on the team. *Id*. at ¶ 12. She holds an MBA and an MS in Health Care Administration from the University of Maryland. *Id*. The complaint doesn't give many details about her experience before joining the Great Lakes West District team. The only detail it provides is that she was a member of other Alfasigma sales teams for two years before switching to the Great Lakes West team in 2014. *Id*. at ¶ 11.

Wilson does not provide any details about her education. However, she had "sixteen years of sales experience," including at least some time as a representative for "more than one pharmaceutical company." *Id*. at ¶ 14.

Plaintiffs don't allege any details about the education and experience of the white male team members except to say that the men had less experience than them, and that several of them "did not even have bachelor's degrees." *Id*. at ¶ 12.

It's a little hard to tell from the complaint how successful Plaintiffs were in their roles, or how their performance compared to other members of the team. Neither Plaintiff provides the most basic facts relevant to their performance: how much product they sold, how much they were supposed to sell, or how their sales compared to the team average.

Both Plaintiffs offer a few details about their performance during certain years. Douglas was on the Great Lakes West team from 2014 to 2018. *Id*. at ¶¶ 11, 73. In 2014, she had a

"year-over-year increase in sales of 11%," which entitled her to an "Exceptional" performance rating.  *Id*. at ¶ 56.  Her sales in 2015 (whatever they were) entitled her to an "Exceeds Expectations" performance rating.  *Id*. at ¶¶ 56, 66.  She does not offer any data about her performance in 2016, 2017, or 2018.

Wilson was on the Great Lakes West team from 2015 to 2018.  *Id*. at ¶¶ 14, 148.  In 2015, she "met all sales goals and was a top performer," and in 2017 she "exceeded all prior year sales goals."  *Id.* at ¶¶ 43, 51.  She does not offer any information about her performance in 2016 or 2018.

Both women won awards at Alfasigma.  From 2015 until she left the company in 2018, Wilson was "district MVP" three times.  *Id*. at ¶ 15.  She had "[t]op year-over-year prescription growth," and was "[t]op ranking for Brand Direct health (the company's mail order pharmacy)," at some point during that period.  *Id*.  The complaint does not pin down when she won those awards.  Douglas won awards when she worked in other districts from 2012 to 2014, but the complaint does not reveal if she won awards while working as a member of the Great Lakes West District team.  *Id*. at ¶ 13.

### D.     Comparing Sales Rep Pay and Promotions

The complaint includes scant information about how much their white male co-workers sold, and how much they were supposed to sell.  The complaint doesn't say much about how the Plaintiffs performed relative to the rest of their team.  But the bottom line seems to be that they performed better than at least some of the white male sales reps.

According to the complaint, Alfasigma paid Douglas and Wilson less than their male colleagues, and denied them promotions, even though they had equal or superior education, experience, and performance.

5

### 1.    Pay Discrimination

Douglas and Wilson allege that Alfasigma compensated them less than the seven white male sales reps on their teams.  The pay differential took a couple different forms.

First, they received less base pay.  Alfasigma paid them salaries in the "$65,000 to $70,000 range," while their male colleagues received "at least $20,000" more.  *Id.* at ¶¶ 29–30.

Second, they received lower merit increases than they deserved.  Wilson was shortchanged in 2016, 2017, and 2018.  In particular, in 2016, she received no merit increase despite meeting "all" of her sales goals and proving herself to be a "top performer."  *Id.* at ¶¶ 43–44.  In 2017, Alfasigma denied her a merit increase yet again.  *Id.* at ¶ 46.  She doesn't provide specific information about her performance the prior year.  But unlike Wilson, some of her white male co-workers received merit increases even though they performed worse.  *Id.* at ¶¶ 47–48.  Wilson "complained to Oliver about the differential merit increases based upon race and gender," but he "made no adjustment."  *Id.* at ¶¶ 49–50.  In 2018, Wilson received a 1.5% merit increase after exceeding all sales goals in 2017.  *Id.* at ¶¶ 51–52.  In comparison, "white team members, and male team members, with lower prior year performance than Wilson" received higher merit increases.  *Id.* at ¶ 53.  After receiving her 2018 merit increase, Wilson complained to Oliver again, informing him that she believed she was given a lower merit increase than her coworkers "based upon her race and gender."  *Id.* at ¶ 54.  Again, he "made no adjustment."  *Id.* at ¶ 55.

Douglas alleges that Alfasigma shortchanged her every year from 2015 to 2018.  In 2015, she was entitled to a 4–6% increase based on her performance the prior year, but only received a 1.75% increase.  *Id.* at ¶¶ 57–58.  White male team members with the same or worse performance received higher increases.  *Id.* at ¶ 64.  In response, Douglas complained to Oliver,

and then to Human Resources. *Id.* at ¶¶ 59, 62. Human Resources refused to tell Oliver to change her award. *Id*. at ¶ 63. In 2016, Douglas was entitled to an increase of at least 2% to 4.99% based on her annual performance, but Oliver only gave her a 1.5% increase. *Id*. at ¶ 66. Again, white male team members with the same or worse performance received higher awards. *Id*. at ¶ 67. In 2017 and 2018, Douglas received "minimal increases, or no increases" while male sales reps and white sales reps with the same or worse performance "continued to get regular, and significantly higher annual increases." *Id*. at ¶ 69. She "continued making complaints of compensation inequity based on gender, and . . . race to Alfasigma[]" until she left the company in 2018. *Id*. at ¶ 70. Alfasigma "never responded" to those complaints. *Id*. at ¶ 72.

Third, Douglas and Wilson did not receive from Oliver the lump sum payments that they had earned. For example, in 2017, Oliver chose a white man for "Team MVP," an award that came with a bonus check of $10,000. *Id*. at ¶ 112. The women allege that the man was "objectively less entitled to the award, based on his performance." *Id*. at ¶ 113.

Fourth, Oliver took away sales opportunities, making it harder for them to make sales and earn more pay. Basically, he identified the most promising customers in their geographic territories and reassigned them to the white male sales reps. He "cherry picked health care providers who were high volume prescribers" of Alfasigma's products and "reassigned these health care providers to other sales reps who were white males." *Id.* at ¶ 33. Sometimes the most promising zip codes – meaning the wealthiest zip codes – were scooped up and reassigned in their entirety. *See id.* at ¶ 35 ("Sometimes Oliver reassigned high-volume, and high income, zip codes, in the middle of an ostensibly exclusive geographic area of contiguous zip codes, from black, female, sales reps, specifically including Douglas and Wilson, to white, male sales reps."); *id.* at ¶ 36 (alleging that "zip codes where the residents had high incomes were desirable").

## 2.    Failure to Promote

The women also allege that Oliver made it difficult for them to be promoted.  He denied them opportunities that they were qualified for, selecting less qualified white men instead.

Wilson wanted to become a district manager, and let Oliver know.  *Id*. at ¶ 79.  Managers at Alfasigma's corporate headquarters decided who received promotions to district manager.  *Id*. at ¶ 77.  But the company did not allow sales reps to interview for district manager positions without the approval of their current district manager.  *Id*.  Oliver repeatedly refused to give Wilson permission to interview for district manager positions, but gave permission to less qualified white male employees.

In January 2017, Wilson asked for permission to interview for a district manager job in Seattle.  *Id.* at ¶ 81.  Oliver refused.  *Id*. at ¶ 82.  But he gave permission to one of the white male sales reps who was "less qualified."  *Id*. at ¶ 83.  That person did not ultimately get the job.  *Id*. at ¶ 84.  Four months later, Wilson asked Oliver for permission to interview for a district manager job in Michigan.  *Id.* at ¶¶ 85–86.  Oliver refused again.  *Id*. at ¶ 86.  But he granted permission to the same white male sales rep.  *Id*.  Again, that person did not get the job.  *Id*. at ¶ 87.  Finally, in 2018, Wilson asked for permission to interview for a district manager job in Arizona.  *Id*. at ¶ 90.  Oliver refused, but granted permission to two white male sales reps who were less qualified.  *Id*.

Douglas wanted to be promoted to a field trainer or to district manager.  *Id*. at ¶¶ 91, 96.  Field trainers still served as sales reps, but took on additional projects, and got paid more.  *Id*. at ¶¶ 91, 95.  Douglas asked Oliver to be promoted to field trainer some unspecified number of times.  *Id*. at ¶¶ 91, 93.  Douglas allegedly told Oliver that she "was qualified for this promotion because of her superior education, experience and skills."  *Id.* at ¶ 92.  Yet he always refused to

actually promote her.  *Id*.  However, Oliver frequently asked her to "train less qualified male sales reps and less qualified white sales reps even though she was denied promotion to the position of field trainer and received no compensation for this work."  *Id*. at ¶ 95.

Douglas was also interested in becoming a district manager.  *Id*. at ¶ 96.  But she never asked Oliver for permission to interview for district manager because "she knew he would deny her request to interview and she wanted to avoid that humiliation."  *Id*.

## II.     Hostile Work Environment

Douglas and Wilson also allege that Oliver and their colleagues treated them poorly because of their race and sex.  They offer five examples.

First, in June 2016, the team hosted a promotional "Medical Food Dinner Program."  *Id*. at ¶ 118.  Oliver assigned Wilson as well as two male sales reps (Jeff Bowen and Jim McNeil) to organize the dinner and recruit doctors to attend.  *Id*.  Wilson ended up shouldering the bulk of the work.  She recruited all the attendees, put the program together, recruited the physician speaker, found the venue, and followed up with every doctor who attended.  *Id.* at ¶¶ 119, 127. On the night of the dinner, Bowen called Wilson roughly 10 minutes before the event.  *Id*. at ¶ 120.  He was lost and wanted directions.  *Id*.  When Wilson tried to give him directions, he responded with "vulgar and sexually offensive language."  *Id.* at ¶ 121 ("'What the F**k,' 'What the F**k,' 'Just give me the G-damn directions with landmarks.'").  In response, Wilson told him "to stop by a gas station for directions, because 'I'm neither your wife, nor girlfriend and you have no right to curse at me like that."  *Id*. at ¶ 122.  After the event, Oliver sent an email to Alfasigma corporate and gave credit for the event to Bowen and McNeil only.  *Id*. at ¶ 126.

Second, in April 2017, Alfasigma held a national sales meeting in New Orleans.  *Id*. at ¶ 107.  During the meeting, "Oliver treated both Plaintiffs like they weren't even part of his

team," and "spent the entire National Sales meeting sitting and interacting with whites only."  *Id*. at ¶ 115.  The women were "not included in any team after-work activities with Oliver and their white co-workers."  *Id*. at ¶ 114.  For example, each manager was supposed to take his or her team on an outing.  "Oliver arranged transportation and reserved dinner at a restaurant for all white team members," but excluded Douglas and Wilson.  *Id*. at ¶ 116.

Third, in December 2017, Douglas sent a picture of her son sitting on Santa's lap to the team.  *Id*. at ¶¶ 102–104.  One of her colleagues (Jim McNeil) responded "with racially offensive emojis, a black Santa, a black number 8-ball, a crack pipe, and a gun, with the text message, 'Ho! Ho! Ho! Stick-em up' and it was signed, "'Jimmy.'"  *Id*. at ¶ 105.  Oliver responded, but did not chastise McNeil.  Instead, Oliver "sent out a text of his own to the entire team, including Douglas, making it clear that he regarded this as a joke he was eager to join in."  *Id*. at ¶ 106.  Oliver's text read:  "'I'd like to see Jim in his business suit sitting on Santa's lap.'"  *Id*.

Fourth, at some point during their employment (the complaint does not reveal when), Oliver organized a team outing to Lake Geneva.  *Id*. at ¶ 129.  Oliver invited the white male sales reps to come two days early to play golf and stay at the "Old Playboy Mansion Hotel."  *Id*. at ¶ 131.  He did not invite any of the women.  *Id*.  When Douglas, Wilson, and the other black female employee arrived two days later, they received the cheapest hotel rooms facing the parking lot.  *Id*. at ¶¶ 132–133.  White male reps were given "upgraded rooms overlooking Lake Geneva."  *Id*. at ¶ 133.

Finally, in 2019,[1] during a team meeting, Wilson overheard Oliver and two other male sales reps having a conversation about guns.  *Id*. at ¶¶ 91–98.[2]  The three men stated that they

---

[1]  The allegation that this incident took place in 2019 is a little mysterious, as both women claim to have left the company in 2018.
[2]  The Court notes that the complaint is missing paragraph 97.  Paragraph 91 appears twice.  The second paragraph 91 should be paragraph 97.

believed the Sandy Hook shooting was a hoax, and one of the sales reps stated: "I take my gun with me when I go into doctors' offices in the 'Ghetto.'" *Id*. at ¶ 99. Oliver told the rep "that he was doing the right thing." *Id*. at ¶ 100. This conversation caused Wilson to worry that Oliver might carry a gun, and that he might bring a gun to work with him. *Id*. at ¶ 101.

## III.    Retaliation

Finally, both Douglas and Wilson allege that the company retaliated against them after they reported discrimination to Human Resources.

The retaliation involving Douglas occurred in 2016. As discussed above, Douglas alleges that in 2015, she was entitled to a 4–6% increase based on her performance the prior year, but only received a 1.75% increase. *Id*. at ¶¶ 57–58. In response, Douglas complained to Oliver, and then to Human Resources. *Id.* at ¶¶ 59, 62. She told Human Resources that "Oliver had discriminated against her on the basis of her gender and her race by giving her a merit increase far below what she was entitled to, based on her prior year performance . . . and Alfasigma's merit increase policies." *Id*. at ¶ 62. Oliver allegedly retaliated against her for reporting him to Human Resources the following February by giving her a 1.5% merit increase when she was entitled to an increase of 2% to 4.99% based on her performance. *Id*. at ¶ 66.

The retaliation involving Wilson occurred in 2018. She alleges that Oliver came up with a pretextual reason to fire her in retaliation for reporting him to Human Resources. Specifically, Wilson called Human Resources and filed a "complaint of sex and race discrimination" after Oliver did not permit her to interview for the district manager position. *Id*. at ¶¶ 134–135.

Three weeks later, Wilson ran into one of her white male co-workers. *Id*. at ¶ 136. The co-worker "verbally assaulted her . . . in retaliation for her complaints to HR about sex and race discrimination by Oliver." *Id*. She does not provide any details about what the co-worker said.

But the co-worker "could only have learned that Wilson had complained to HR from Oliver or HR itself." *Id.*

Wilson also reported that confrontation with the co-worker to Human Resources. Human Resources told her that they would look into her complaint, but she never heard back from them, even after following up. *Id.* at ¶¶ 138–140.

About a week later, at the beginning of July 2018, things deteriorated. Oliver put Wilson on a 90-day performance improvement plan. *Id.* at ¶ 141. Wilson doesn't give any details about why she was put on the plan, what the plan involved, or how she performed on it.

Then, in October, Oliver told Wilson that he had found some errors in her expense reports and was going to report her to Human Resources. *Id.* at ¶¶ 142, 147. According to him, some reports were missing receipts, and other reports were late. *Id.* at ¶ 142.

Wilson was surprised. It was "not unusual for reps to turn in expense reports without receipts for all expenses," and the white male sales reps turned in incomplete or late expense reports "as frequently or more frequently" than Wilson did. *Id.* at ¶¶ 143–146. Also, Wilson alleges that "this was the first time Oliver ever reported missing receipts from a rep's expense report to HR." *Id.* at ¶ 147.

On November 1, 2018, Oliver told Wilson that she was being terminated by Alfasigma "because of late and incomplete expense reports." *Id.* at ¶ 149. She was given "no other reason for her termination." *Id.*

## IV.     The Charge with the EEOC, and the Filing of the Lawsuit

On January 21, 2019, Wilson filed a Charge of Discrimination with the EEOC alleging that Alfasigma had discriminated against her on the basis of her race and her sex. *See* Charge of

Discrimination, at 1 (Dckt. No. 63-1).  The complaint does not allege that Douglas filed a Charge of Discrimination with the EEOC.

Douglas and Wilson filed this lawsuit on April 3, 2019.  *See* Cplt. (Dckt. No. 1).  The original complaint included four counts, including two counts under the FLSA (one for discrimination, one for retaliation) and two counts under section 1981 (one for discrimination, one for retaliation).  *Id.* at ¶¶ 76–93.  At that point, Wilson had not yet received a right to sue letter from the EEOC, so the complaint did not include claims under Title VII.

On October 10, 2019, Plaintiffs filed an amended complaint with the same four counts.  *See* First Am. Cplt., at ¶¶ 151–168 (Dckt. No. 36).  The amended complaint did not include any claims under Title VII because the EEOC had not yet issued a right to sue letter.

Nearly a year later, on October 3, 2020, Wilson received a right to sue letter from the EEOC dated September 29, 2020.  *See* Second Am. Cplt., at ¶ 170 (Dckt. No. 73).  In response, Plaintiffs filed a second amended complaint and added Wilson's claims under Title VII.  *Id*. at ¶¶ 169–176.

The complaint lists five counts.  However, a number of those counts seem to include claims under a few different legal theories.  By the Court's count, the complaint includes fourteen different claims.  (And, for purposes of clarity, the rest of this opinion treats the complaint as alleging fourteen different claims, too.)

Count I is a claim by both Plaintiffs under the Fair Labor Standards Act (more specifically, the Equal Pay Act).  *Id.* at ¶¶ 151–154.  The women allege sex discrimination.  Count II is another claim by both Plaintiffs under the Fair Labor Standards Act, for retaliation. (For Counts I & II, that's a total of four claims.).  *Id.* at ¶¶ 155–158.

Count III is a claim by both Plaintiffs under section 1981. *Id.* at ¶¶ 159–163. It seems to include two theories (and if treated separately, that's a total of four claims, meaning two claims by each Plaintiff). It alleges racial discrimination and a racially hostile work environment. Count IV is a claim by both Plaintiffs under section 1981, for retaliation. *Id.* at ¶¶ 164–68. (For Counts III & IV, that's a total of six claims.).

Count V is a claim by Wilson (only) under Title VII. *Id.* at ¶¶ 169–176. The theories seem to be racial discrimination, sex discrimination, a racially hostile work environment, and retaliation. (For Count V, that's a total of four claims.).

## Discussion

Alfasigma makes one overarching argument (about a "shotgun pleading") for a complete dismissal of the complaint. Then, Alfasigma moved to dismiss or limit the scope of seven of Plaintiffs' fourteen claims under Rule 12(b)(6). Specifically, Alfasigma challenges (1) the claims under the FLSA for sex discrimination and retaliation; (2) the claims for racial discrimination under section 1981; and (3) Wilson's claim for a hostile work environment under Title VII. The Court briefly reviews the legal standard, and then tackles the claims under each statute.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A district court begins by "taking note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Then, turning to the complaint itself, it "accept[s] the well-pleaded facts in the complaint as true," but ignores "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 681).

When a defendant moves to dismiss based on the notion that a plaintiff has failed to state a "plausible" claim for relief, a district court asks whether the well-pleaded factual allegations, taken together, allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. That is, the plaintiff's allegations must tell "a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). If they don't, the complaint must be dismissed. *See Iqbal*, 556 U.S. at 678.

When a defendant moves to dismiss based on the statute of limitations, a court asks whether there is "a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). If there is, then the complaint survives, and "questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.* "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). The Seventh Circuit recognizes that a "party may plead itself out of court by pleading facts that establish an impenetrable defense to its claims," and that "[i]f the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (cleaned up).

## I.    Shotgun Pleading

Alfasigma begins with an overarching critique of the way that Plaintiffs authored the complaint. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 3 (Dckt. No. 80). Alfasigma points

out that the complaint includes a number of different claims, and each count incorporates all of the allegations, not simply the most relevant subset. *Id.* For example, Count V (Wilson's Title VII claims) incorporates all of the factual allegations in the complaint, even though many of those paragraphs have nothing to do with Wilson. *Id.*

Alfasigma faults the complaint for engaging in "shotgun pleading," which is the over-incorporation of factual allegations in the counts. *See Chriswell v. Vill. of Oak Lawn*, 2013 WL 5903417, at *5 (N.D. Ill. 2013), *aff'd sub nom. Chriswell v. O'Brien*, 570 F. App'x. 617 (7th Cir. 2014) ("The phrase 'shotgun pleading' refers to complaints in which litigants use excessive incorporation, taking advantage of Rule 10(b)."); *see also SEC v. Winemaster*, 2021 WL 1172773, at *14 (N.D. Ill. 2021) ("Shotgun pleading refers to a pleading style in which each count of the complaint 'incorporates by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged are not material to the claim, or cause of action, appearing in a count's heading.'") (citation omitted). At times, that style can "'prevent the opposing party from reasonably being able to prepare a response or simply make the burden of doing so more difficult.'" *Chriswell*, 2013 WL 5903417, at *5 (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1326 (3d ed. 2020)).

But not always. Inartful clumping can create confusion when, for example, it is unclear what allegations apply to which defendants. *See, e.g., Uldrych v. Village of Merrionette Park*, 2020 WL 7714213, at *1 n.1 (N.D. Ill. 2020). But incorporating prior allegations by reference isn't particularly problematic when everyone understands what the plaintiff is alleging. After all, Rule 10(c) expressly authorizes a "statement in a pleading" to be "adopted by reference elsewhere in the same pleading." *See* Fed. R. Civ. P. 10(c). The key question is whether the complaint puts the defendants on notice of the claim and gives defendants a fair opportunity to

respond, without creating confusion or hiding the ball. *See Koh v. Graf*, 2013 WL 5348326, at *5 n.3 (N.D. Ill. 2013).

Alfasigma is undoubtedly right that this complaint isn't easy to digest. There are a lot of facts, and a lot of claims, and it is not always simple to figure out which facts apply to what claims.

Alfasigma is also right that courts have expressed distaste for shotgun pleadings. *See CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011) ("Courts have discouraged this type of 'shotgun' pleading where each count incorporate[s] by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged are not material to the claim, or cause of action, appearing in a count's heading.") (citation omitted); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1326 (4th ed. 2021) ("When a party indiscriminately incorporates assertions from one count to another, for example, by incorporating all facts or defenses from all previous counts into each successive count, it can result in an unnecessarily long and confusing pleading and counts that contain irrelevant facts or defenses, and it can prevent the opposing party from reasonably being able to prepare a response or simply make the burden of doing so more difficult.").

That said, this complaint is not too confusing. It puts Alfasigma on notice of the claims, and does not create uncertainty about what, exactly, Plaintiffs are alleging. Firing off a lot of allegations all at once is not enough to sink a complaint when the defendant can follow along without much trouble. And that's the case here.

## II.     FLSA Claims

Plaintiffs make four claims under the FLSA. First, both women allege that Alfasigma violated the Equal Pay Act (a provision of the FLSA) by paying them less than their similarly-

situated male colleagues.  *See* Second Am. Cplt., at ¶¶ 151–154 (Dckt. No. 73).  Second, they allege that Alfasigma violated the anti-retaliation provision of the FLSA when it allowed Oliver to retaliate against them after they complained to Human Resources about pay and promotion discrimination.  *Id.* at ¶¶ 155–158.  Alfasigma has moved to dismiss all four claims.

### A.      Douglas and Wilson's Equal Pay Act Claims

First, Alfasigma argues that the claims under the Equal Pay Act fail because they are factually deficient, or self-defeating.  *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 5–7 (Dckt. No. 80).

"The Equal Pay Act, an amendment to the Fair Labor Standards Act, forbids paying workers of one sex less than workers of the opposite sex for equal work that requires equal skill, effort, and responsibility, unless the pay differential is justified by factors other than sex, such as seniority, merit, experience, or education."  *Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *see also* 29 U.S.C. § 206(d)(1).

To state a claim under the Equal Pay Act, a plaintiff must allege:  "(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions."  *See Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 912–13 (7th Cir. 2002) (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1208–09 (7th Cir. 1989)).

Alfasigma argues that the complaint is factually deficient in two ways.  First, the complaint doesn't include the names of all of the similarly-situated male employees.  *See* Mem. of Law in Supp. of Mt. to Dismiss, at 5 (Dckt. No. 80).  In the company's view, the absence of names renders the complaint "impermissibly vague" and "impossible" to defend against.  *Id.*

Not so much. Plaintiffs do refer to two of the similarly-situated men by name: Jeff Bowen and Jim McNeil. *See* Second Am. Cplt., at ¶ 118 (Dckt. No. 73). But more importantly, the Federal Rules do not require a plaintiff to name names. A complaint does have to identify the names of the parties in the caption, if they are known. *See* Fed. R. Civ. P. 10(a) (requiring a caption to "name all the parties"). But a complaint does not have to introduce the full cast of characters and divulge their names. A complaint is not a witness list.

And there's no genuine confusion, either. Plaintiffs may not identify all similarly-situated male employees by name, but it's clear who they're referring to. The complaint is about the seven men on their sales team between 2015 and 2018. *Id*. at ¶ 27. That's a discrete group.

The fact that Plaintiffs don't identify those seven men by name does not make it "impossible" for Alfasigma to respond. Presumably Alfasigma knows who was on Alfasigma's sales team. And if Alfasigma wants more details, it can serve discovery.

Second, Alfasigma argues that Plaintiffs haven't alleged enough facts to support a plausible inference that they, and the men on their team who were paid more, did "equal work which requires equal skill, effort, and responsibility." *Markel*, 276 F.3d at 912–13 (quoting *Fallon*, 882 F.2d at 1208–09); *see also* Mem. of Law in Supp. of Mtn. to Dismiss, at 5–6 (Dckt. No. 80).

Again, that argument falls flat. Eventually, to establish the element of equal work, a plaintiff "must show that her job and a male employee's job involved a 'common core of tasks' or that 'a significant portion of the two jobs is identical.'" *Howard*, 234 F.3d at 1005 (quoting *Fallon*, 882 F.2d at 1209). But at the motion to dismiss stage, a plaintiff only needs to plead enough facts to support a plausible inference that her job is similar to the job of a male co-worker.

Douglas and Wilson easily clear that hurdle. They allege that all twelve members of the sales team had the same position. And in practice, they had the same role, too. They shared a responsibility for "making face-to-face contact with health providers" in their assigned areas, "telling them the merits of various Alfasigma products" and "encouraging them to prescribe Alfasigma products for their patients." *See* Second Am. Cplt., at ¶ 20 (Dckt. No. 73). Nothing in the complaint suggests that other sales reps had unique responsibilities, or that the men had roles that required additional skill, effort, or responsibility.

In the alternative, Alfasigma argues that Plaintiffs have pled themselves out of court by alleging that Oliver gave them unfavorable territory compared to their male counterparts. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 6–7 (Dckt. No. 80). Under the Equal Pay Act, a pay disparity is acceptable if it "is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974); *see also* 29 U.S.C. § 206(d)(1). Alfasigma basically reads the complaint as an admission that Plaintiffs were less productive than their male counterparts. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 6 (Dckt. No. 80) ("These allegations serve to preclude Plaintiffs' recovery under the EPA because any alleged differences in wages were based on different levels of production and factors other than sex . . . .").

Not at all. For starters, Douglas and Wilson allege that taking away sales opportunities was part of the problem. According to them, Oliver reassigned the most valuable customers in their territories to their white male counterparts. *See* Second Am. Cplt., at ¶¶ 32–38 (Dckt. No. 73). The act of taking away opportunities was, in and of itself, a discriminatory act. *Id.* Taking

away sales opportunities cannot defeat a sex discrimination claim when taking away sales opportunities was an act of sex discrimination.

Plaintiffs allege that the deck was stacked against them. And even then, they did not receive what they were owed. The complaint alleges that Alfasigma denied them merit increases and prizes that they were entitled to receive based on their sales. *Id.* at ¶¶ 29–31, 39–75, 112–113. Plaintiffs did not plead themselves out of court by alleging a lack of sales. They allege that the company did not compensate them fairly for the sales that they did have.

### B. Douglas and Wilson's FLSA Retaliation Claims

Next, Alfasigma moves to dismiss the retaliation claims under the FLSA. To state a claim, "a plaintiff must plausibly allege that he engaged in activity protected under the Act, his employer took an adverse employment action against him, and a causal link exists between the two." *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018) (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012)).

### 1. Douglas's FLSA Retaliation Claim

Alfasigma argues, and the Court agrees, that Douglas's retaliation claim is time barred. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 8 (Dckt. No. 80).

A two-year statute of limitations applies to FLSA claims "unless the violation was willful, in which case the limitations period is three years." *Howard v. City of Springfield*, 274 F.3d 1141, 1144 (7th Cir. 2001). "An employer acts willfully, for purposes of establishing the proper statute of limitations, where he knows or shows reckless disregard for whether his actions are unlawful under the FLSA." *Bankston v. Illinois*, 60 F.3d 1249, 1253 (7th Cir. 1995). The statute of limitations starts to run when the plaintiff knows or should know that he or she has

suffered an injury.  *See Young Chul Kim v. Capital Dental Tech. Lab., Inc.*, 279 F. Supp. 3d 765, 770–71 (N.D. Ill. 2017).

Douglas and Wilson filed their complaint on April 3, 2019.  *See* Cplt. (Dckt. No. 1). Therefore, claims about non-willful conduct before April 3, 2017, are time barred, and claims about willful conduct before April 3, 2016, are time barred.

Douglas alleges that Oliver retaliated against her in February 2016 when he gave her a lower merit raise because she complained to HR about him.  *See* Second Am. Cplt., at ¶¶ 62, 66. Therefore, even if the limitations period were three years, any claim about the 2016 merit raise would be time barred.

Douglas's retaliation claim does not rest on anything else, so it is dismissed.

### 2.    Wilson's FLSA Retaliation Claim

Alfasigma argues that Wilson has failed to state a retaliation claim under the FLSA because she failed to allege that she engaged in a protected activity.  *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 8 (Dckt. No. 80).  Again, the Court agrees.

Under the FLSA, "fil[ing] any complaint" is a protected activity.  *See* 29 U.S.C. § 215(a)(3); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 4 (2011). A complaint must be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Kasten*, 563 U.S. at 14.

Wilson did "fil[e] a complaint" with Human Resources.  *See* Second Am. Cplt., at ¶ 135 (Dckt. No. 73).  She complained that her boss had refused to allow her to interview for a promotion, and selected a less qualified (but otherwise similarly situated) white male employee to interview instead because of her sex and race.  *Id.* at ¶¶ 81–90, 135.

22

Alfasigma argues, and the Court agrees, that no reasonable employer would have understood that complaint to allege a violation of the Equal Pay Act. A woman alleging that she was passed over for a promotion because of her sex can bring a claim under Title VII, but not under the Equal Pay Act. The latter statute applies to wage discrimination, that is, when an employer pays unequal wages to employees of the opposite sex. *See Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992) ("The Equal Pay Act was directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex. Title VII, on the other hand, forbids discrimination on the basis of gender, race, or national origin in a wide range of employment practices, including hiring, firing, training, *and promoting*.") (emphasis added); *see also Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 378 (7th Cir. 1998); *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016).

That conclusion flows naturally from the text of the statute. The Equal Pay Act provides that "[n]o employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex" for "equal work" on jobs requiring "equal skill, effort, and responsibility" and "similar working conditions." *See* 29 U.S.C. § 206(d)(1). The statute is about unequal "pay[]" for equal work, and is not about discrimination writ large. *Id.*

Wilson did not complain about unequal wages per se. She complained about the lack of a promotion. That's actionable under Title VII, but not the Equal Pay Act. No reasonable employer would have understood her to be alleging a violation of the Equal Pay Act, or the FLSA more broadly.

In sum, the Equal Pay Act claims survive, and the FLSA retaliation claims are dismissed.

**III.     Section 1981 Discrimination Claims**

Next, Alfasigma moves to dismiss Plaintiffs' claims under section 1981.  Recall,

Plaintiffs make six claims under section 1981.  First, both Plaintiffs allege that Alfasigma paid

them less than their similarly-situated white co-workers and passed them over for promotions

because of their race.  Second, they allege that Alfasigma subjected them to a hostile work

environment on account of their race.  Finally, they allege that Alfasigma retaliated against them

after they reported race-based discrimination to Human Resources.

Alfasigma makes a general point about the statute of limitations, but only takes aim at the

claims about lesser pay and the lack of promotions.

**A.     Statute of Limitations**

First, Alfasigma argues that the statute of limitations bars any claims based on conduct

that took place before April 3, 2015.  And, according to Alfasigma, if it is not clear that a claim

is timely, the Court should dismiss it as untimely.

The statute of limitations under section 1981 is four years.  *See Dandy v. United Parcel

Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004) (holding that a four-year statute of limitations

applies to plaintiff's claims under section 1981 for "(1) hostile work environment; (2) failure to

promote; (3) disparate treatment in terms of compensation; and (4) retaliation").

Douglas and Wilson filed their complaint on April 3, 2019, so claims about conduct

before April 3, 2015, are time barred.  *See* Dckt. No. 1.  That boundary means that Douglas is

barred from bringing claims under section 1981 about the merit increase she received in

February 2015.  But the rest of their allegations are timely.

Alfasigma also argues that the statute of limitations bars allegations that "include no

date" because "it is impossible to discern whether they would be timely."  *See* Mem. of Law in

Supp. of Mtn. to Dismiss, at 11 (Dckt. No. 80). That argument stands the motion-to-dismiss standard on its head.

"[A] complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). So, the fact that a plaintiff does not attach precise dates to all the allegations does not mean that they're time barred. When it comes to the statute of limitations, a plaintiff can plead herself out of court, but a plaintiff does not have to plead herself *into* court.

The presumption is that a complaint is timely, and that presumption applies unless the complaint itself reveals that it is late. A complaint isn't untimely unless and until the plaintiff shows that it is *timely*. A complaint is timely unless the plaintiff shows that it is *un*timely.

**B.    Douglas and Wilson's Claims about Merit Increases and Racial Discrimination**

Next, Alfasigma argues that the claims about the merit increases are factually deficient.

At the motion to dismiss stage, a plaintiff claiming employment discrimination under section 1981 must allege that the employer "instituted a specific adverse employment action against him" because of race. *See Phillips v. Baxter*, 768 F. App'x. 555, 559 (7th Cir. 2019). Causation matters, even at the pleading stage. "[A] plaintiff must initially plead and ultimately prove that, *but for race*, he would not have suffered" the adverse employment action. *See Mir v. State Farm Mut. Auto. Ins. Co.*, 847 F. App'x. 347, 350 (7th Cir. 2021), *reh'g denied* (Mar. 11, 2021) (citing *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)) (emphasis in original). "A plaintiff may prove intentional discrimination, under Title VII or § 1981, through direct or circumstantial evidence (direct method) or resort to the indirect burden-shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973)." *See Dandy*, 388 F.3d at 272.

Douglas and Wilson allege at least two types of adverse employment actions: the denial of merit increases, and the withholding of promotion opportunities. *See Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (explaining that adverse employment actions "can involve the [plaintiff's] current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace").

Plaintiffs have alleged more than enough facts to support their claim that "but for" their race, they would have received more merit increases and promotional opportunities. They allege that their similarly-situated white colleagues received higher merit increases and more promotional opportunities. *See* Second Am. Cplt., at ¶¶ 43–96 (Dckt. No. 73). They also allege examples of racism in the workplace, which support an inference that facially-neutral acts might have been motivated by racial animus. For example, they describe racist text messages sent by other employees. *Id.* at ¶ 105. And they allege that Oliver excluded them from team events and outings. *Id.* at ¶¶ 114, 116, 131–133. The complaint alleges enough to pass the pleading stage.

Alfasigma makes two additional arguments in the alternative. First, Alfasigma argues that even if Plaintiffs have pled facts supporting an inference that Alfasigma took those adverse employment actions because of their race, they also pled facts supporting the inference that Alfasigma took those adverse actions because of their sex. Therefore, they have failed to plead that race was the "but for" cause of those actions. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 10–11 (Dckt. No. 80).

At the pleading stage, a plaintiff does not have to pick a horse. A plaintiff can offer different theories in the alternative. *See* Fed. R. Civ. P. 8(d)(2) (permitting a party to "set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count or

defense or in separate ones," and providing that "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient"); *see also Alamo v. City of Chicago*, 2018 WL 5830763, at \*4 (N.D. Ill. 2018) (rejecting the defendant's argument that the plaintiff "has failed to state a claim because he advances the mixed-motive theory that he was discriminated against both for his disability and for his race and national origin" because the defendant "has offered, and this Court is aware of, no authority establishing that alleging multiple forms of illegal discrimination constitutes an improper mixed-motive theory"). So, a plaintiff can allege that the defendant took a particular action solely because of race, or the defendant took a particular action solely because of sex. Or maybe both.

For example, in *Dietrich v. C.H. Robinson*, 2019 WL 1044406 (N.D. Ill. 2019), the plaintiff brought claims under the ADA and Title VII, arguing that her employer had taken a particular adverse action against her because of her disability *and* because of her sex. Like section 1981, the ADA has a but-for causation standard, requiring a party to plead and ultimately prove that but for the disability, the employer would not have taken the adverse action. *Id.* at \*3. The court recognized that the Federal Rules allow a party to plead in the alternative. So, the plaintiff could plead that the adverse action was attributable to her sex *or* to her disability. *Id.* ("While the Court previously indicated that Plaintiff could not attribute the alleged adverse employment actions to both gender and disability given the ADA's 'but-for' causation standard, the Court now concludes that at the pleading stage, such a requirement is not necessary.").

Alfasigma relies on a case that offers no help. *See Parks v. Speed Tile & Appraisal Review Servs.*, 318 F. Supp. 3d 1053 (N.D. Ill. 2018). In *Parks*, the court dismissed a plaintiff's claims under section 1981 and Title VII because she never alleged that her employer took a materially adverse action against her on account of *any* protected characteristic. The problem

wasn't too many adverse actions; the problem was too few. *Id.* at 1064 (dismissing plaintiff's claims because she "has not made even a conclusory allegation that would link her membership in a protected class to her being denied an advancement opportunity and a pay increase").

Next, Alfasigma makes a cursory argument that "Wilson's claim regarding her failure to receive a merit increase in 2016 is belied by other allegations in the [second amended complaint], which assert that Douglas – another African American female – did, in fact, receive a merit increase that year." *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 11 (Dckt. No. 80). That argument misunderstands the inquiry at the pleading stage. "For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The question is whether Plaintiffs have provided "enough details about the subject-matter of the case to present a story that holds together." *Id.* The fact that some of their allegations might cut both ways does not fatally undermine the claim.

### C. Douglas and Wilson's Claims About Failure to Promote

Finally, Alfasigma takes aim at the claims about the lack of promotions. The gist of the argument is that Plaintiffs have failed to check all of the boxes.

To state a claim for failure to promote, a plaintiff must allege that "(1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected group who was not better qualified for the position that she sought." *Jaburek*, 813 F.3d at 631.

Douglas has not stated a claim about the lack of a promotion. Douglas alleges that she was interested in being promoted to the role of district manager. *See* Second Am. Cplt., at ¶¶ 91,

96 (Dckt. No. 73). But she never applied. Douglas alleges that she never asked Oliver for permission to interview for a district manager job because she was certain he would say no. *Id.* at ¶ 96. She did not apply, so she was not rejected, so she has no claim.

Douglas does allege that she "request[ed]" a promotion to the role of field trainer, and was denied. *Id.* at ¶ 93. But the complaint does not reveal much else. She gives no details about which reps were field trainers, and whether any of them belonged to a protected class. Therefore, she has not alleged that someone outside of a protected group received better treatment, so she has not stated a claim. *See Ichile v. City of Chicago*, 1996 WL 264708, at *4 (N.D. Ill. 1996) (dismissing failure to promote claim where plaintiff failed to allege that the promotion at issue had gone to a similarly situated employee outside of his protected class).

Unlike Douglas, Wilson does allege a claim about the lack of a promotion. Wilson alleges that she was interested in a district manager position, and that before she could apply, she needed her supervisor's permission. *See* Second Am. Cplt., at ¶¶ 77, 79 (Dckt. No. 73). Wilson asked for permission each time a district manager position was posted, and each time she asked for permission, Oliver denied her requests. *Id.* at ¶¶ 79–90. But he did give permission to her less qualified white co-workers. *Id.*

Alfasigma argues that Wilson never "applied" for the job because she never submitted an application. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 11 (Dckt. No. 80). That's semantics. Wilson "applied" for the job in the only way she was able to – by asking for permission to do so. She is not barred from bringing her claim because her supervisor did not give her permission to submit an application form. He blocked the door.

In sum, Douglas's section 1981 discrimination claim is dismissed to the extent that it relies on a failure-to-promote theory. The remainder of the Plaintiffs' section 1981 claims survive.

## IV. Title VII

Finally, Wilson also brings four claims under Title VII: pay/promotion discrimination on account of sex, pay/promotion discrimination on account of race, hostile work environment, and retaliation. Alfasigma makes an argument about the statute of limitations for all four claims. Alfasigma also moves to dismiss Wilson's claim for hostile work environment.

### A. Statute of Limitations

First, Alfasigma argues that Wilson is barred from bringing any of her Title VII claims about conduct that occurred before March 27, 2018. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 12 (Dckt. No. 80).

In Illinois, an employee must satisfy two deadlines to bring a timely Title VII claim. First, she must file her charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. *See Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 860 (7th Cir. 2005). Second, she must file her complaint within 90 days of receiving her right to sue letter from the EEOC. *See Reschny v. Elk Grove Plating Co.*, 414 F.3d 821, 823 (7th Cir. 2005).

Here, only the first requirement is at issue. Wilson filed her complaint with the EEOC on January 21, 2019. So, Alfasigma is correct that claims about conduct before March 27, 2018, are time barred unless a tolling doctrine applies.

From there, things get fuzzy. Alfasigma doesn't point to any particular conduct alleged in the complaint that is time barred. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 12 (Dckt. No. 80) ("Wilson's Title VII claims are time-barred to the extent they improperly seek to rely

30

upon alleged acts of race or gender discrimination that occurred more than 300 days before her EEOC charge was filed."). Nor does Wilson make any argument about tolling. *See* Pls.' Resp. in Opposition to Def.'s Mtn. to Dismiss, at 12 (Dckt. No. 84).

So, at this point, this issue is not ripe for resolution. Alfasigma flags the statute of limitations, but does not identify any allegations in the complaint that are facially time barred. The company is free to raise it again at the summary judgment stage.

### B. Charge of Discrimination

Next, Alfasigma argues that Wilson's claim about a racially hostile work environment under Title VII fails because she did not include any such claim in her Charge of Discrimination with the EEOC. *See* Mem. of Law in Supp. of Mtn. to Dismiss, at 12–14 (Dckt. No. 80).

"Generally a plaintiff may not bring claims under Title VII that were not originally brought among the charges to the EEOC." *Harper v. Godfrey Co.*, 45 F.3d 143, 147–48 (7th Cir. 1995). This rule both "afford[s] an opportunity for the EEOC to settle the dispute between the employee and employer and put[s] the employer on notice of the charge against it." *Id.* at 148. Nevertheless, courts have allowed plaintiffs to proceed on claims not explicitly set forth in a charge of discrimination if the claim is "'like or reasonably related' to the EEOC charges," and the claim in the complaint "reasonably [could] be expected to grow out of an EEOC investigation of the charge[]." *Id.* (citations omitted). For purposes of this standard, "[t]he claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals.*" *Id.* (internal quotation marks and citations omitted) (emphasis in original).

Alfasigma argues, and the Court agrees, that Wilson's EEOC charge made no mention of a hostile work environment. She expressly complained about a lower base salary, and about the denial of merit increases. *See* Charge of Discrimination, at 1 (Dckt. No. 63-1). She also clearly complained about retaliation. *Id.* But she did not raise any issues about derogatory comments, harassment, exclusion, or the other behavior that underlies her hostile work environment claims. *Id.* She didn't raise it with the EEOC, so she can't raise it now under Title VII.

## Conclusion

The Court grants in part and denies in part Defendant's motion to dismiss. The Court dismisses both Plaintiffs' FLSA retaliation claims. The Court dismisses Douglas's section 1981 discrimination claim to the extent that it relies on a failure-to-promote theory. The Court dismisses Wilson's Title VII hostile work environment claim. The motion to dismiss is otherwise denied.

Date:   June 17, 2021

_____
Steven C. Seeger
United States District Judge