## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| YAH DOUGLAS and | ) | |
| BRIDGET WILSON, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 19-cv-2272 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ALFASIGMA USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves discrimination claims by two former employees of Alfasigma USA, Inc., a medical foods provider. Plaintiffs Yah Douglas and Bridget Wilson worked as sales representatives at Alfasigma. Both Plaintiffs are black women. They sold medical food products to doctors in the Chicagoland area and other parts of Illinois.

Plaintiffs don't paint a rosy picture of their time at Alfasigma. They claim that they received lower quarterly bonuses than their white, male colleagues after their manager didn't give them credit for sales to doctors in their sales territories. They also claim that they experienced a hostile work environment based on colleagues' offensive remarks. And they claim that they were retaliated against for complaining about discrimination.

In 2018, both Plaintiffs left Alfasigma. Douglas quit, and Wilson was fired. They later sued Alfasigma, alleging discrimination (based on sex and race), retaliation, and a hostile work environment. Both Plaintiffs bring claims under the Equal Pay Act, 29 U.S.C. § 206, and 42 U.S.C. § 1981. Wilson also brings claims under Title VII of the Civil Rights Act of 1964.

After discovery, Alfasigma moved for summary judgment on some, but not all, of the claims. For the following reasons, Alfasigma's motion for partial summary judgment as to Douglas is granted in full, and its motion as to Wilson is granted in part and denied in part.

## Procedural Background

Before diving in, it is helpful to set the stage a little. There are a lot of claims, brought under different theories. And there are two Plaintiffs whose claims are similar but not always directly related.

This Court has already dismissed some of the claims, based on some of the theories, when ruling on Alfasigma's motion to dismiss the second amended complaint. *See* 6/17/21 Mem. Opin. & Order (Dckt. No. 86). The Court begins by clarifying what claims are pending, and which claims are the target of Alfasigma's motion for summary judgment.

Start with Douglas. She originally brought four Counts, but Count III encapsulates two distinct theories, so the Court treated that Count as two claims. That's a grand total of five claims. Of the five claims, four remain in place. *See id.* at 13–14.

Count I alleges sex discrimination under the Fair Labor Standards Act (more specifically, the Equal Pay Act). *Id.* at 13. Count II alleges retaliation under the Fair Labor Standards Act for opposing sex discrimination. *Id.* The Court has already dismissed that claim for failure to state a claim under Rule 12(b)(6). *Id.* at 21–22. Count II is no longer at issue.

Count III is a claim under 42 U.S.C. § 1981. *Id.* at 14. As pled, the claim is based on two legal theories (for a total of two claims): racial discrimination and a racially hostile work environment. *Id.* The Court dismissed in part Douglas's claim of racial discrimination under section 1981 to the extent that it was based on a failure-to-promote theory. *Id.* at 28–29. The

2

rest of the race-discrimination allegations remain in the case. Finally, Count IV is also a claim under section 1981, this time for retaliation based on opposing racial discrimination. *Id.*

Alfasigma seeks summary judgment on Douglas's sex and race discrimination claims (Counts I and III), but only in part. It contends that Douglas's bonus payments were not discriminatory, either on the basis of sex (Count I) or on the basis of race (Count III). *See* Def.'s Mem. in Support of Mtn. for Summ. J. as to Douglas, at 3–9 (Dckt. No. 141).

However, Douglas alleges more than just discriminatory bonuses in the second amended complaint. She also alleges that she received less base pay than her white, male colleagues. *See* Second Am. Cplt., at ¶¶ 39–42, 56–68, 151 (Dckt. No. 73). Specifically, she alleges that she was discriminated against on the basis of her sex and race when Alfasigma determined her year-over-year merit increases in base pay. *Id.* (The Court's ruling on Alfasigma's motion to dismiss discussed the difference between base pay and bonuses. *See* 6/17/21 Mem. Opin. & Order, at 3 (Dckt. No. 86).)

That portion of Douglas's sex and race discrimination claims is not contested at summary judgment, so the Court need not consider it. *See* Def.'s Mtn. for Summ. J. as to Douglas, at 1 n.1 (Dckt. No. 140) ("Alfasigma is not moving for summary judgment on Douglas's claims under the Equal Pay Act or 42 U.S.C. § 1981 to the extent they rely on allegations relating to unequal salaries or annual salary increases."). Those claims are headed to trial.

Alfasigma also seeks summary judgment on Douglas's hostile-work-environment claim (Count III) and retaliation claim (Count IV) under section 1981. *See* Def.'s Mem. in Support of Mtn. for Summ. J. as to Douglas, at 9–15 (Dckt. No. 141). Here, Alfasigma moves for summary judgment on the claims in full.

So, when ruling on Alfasigma's partial motion for summary judgment as to Douglas (Dckt. No. 140), the Court considers Douglas's allegations of unequal bonus payments under the Equal Pay Act and section 1981. The allegations about Douglas's base pay aren't the subject of the motion for summary judgment. The Court also considers Douglas's claims of hostile work environment and retaliation under section 1981 in full.

Next, consider Plaintiff Wilson's claims. She originally brought nine claims in the amended complaint, but only seven remain in play. *See* 6/17/21 Mem. Opin. & Order, at 13–14 (Dckt. No. 86). Wilson's first five claims mirror Douglas's claims. Count I alleges sex discrimination under the Equal Pay Act. *Id.* at 13. Count II alleges retaliation under the Fair Labor Standards Act for opposing sex discrimination, and like Douglas's claim, the Court dismissed that claim for failure to state a claim. *Id.* at 13, 22–23.

 Count III alleges both race discrimination and a racially hostile work environment under section 1981 (for a total of two claims). *Id.* at 14. Count IV alleges retaliation under section 1981 for opposing race discrimination. *Id.*

Count V, however, is specific to Wilson. *Id.* It is a claim under Title VII of the Civil Rights Act of 1964 that has four theories: (1) race discrimination, (2) sex discrimination, (3) a racially hostile work environment, and (4) retaliation for opposing race discrimination. *Id.* The Court dismissed one of these theories – the racially hostile work environment – when ruling on Alfasigma's motion to dismiss. *Id.* at 31–32. So, only three theories remain under Title VII: race discrimination, sex discrimination, and retaliation.

Once again, Alfasigma's motion for partial summary judgment addresses all seven claims, but sometimes only in part. Alfasigma seeks summary judgment on Wilson's discrimination claims under section 1981 (race) and Title VII (race and sex) to the extent that

they are based on her discipline, termination, and failure to be promoted. *See* Def.'s Mem. in Support of Mtn. for Summ. J. as to Wilson, at 4–8 (Dckt. No. 143). It also moves for summary judgment on her hostile-work-environment claim under section 1981. *Id.* at 8–10.

Alfasigma also moves for summary judgment on Wilson's retaliation claims, under both section 1981 (Count IV) and Title VII (Count V). *Id.* at 10–14.

Finally, the company moves for summary judgment on Wilson's claims of race and sex discrimination that are based on discriminatory bonus payments. *Id.* at 14–19. Those claims include her claim of sex discrimination under the Equal Pay Act (Count I). *Id.* at 14–18. They also include her claim of race discrimination under section 1981 (Count III) and her claims of race and sex discrimination under Title VII (Count V). *Id.* at 18–19.

However, like the situation with Douglas, Alfasigma is *not* moving for summary judgment based on Wilson's allegations of discriminatory increases in base pay amounts. *See* Def.'s Mtn. for Summ. J. as to Wilson, at 1 n.1 (Dckt. No. 142) ("Alfasigma is not moving for summary judgment on Wilson's claims under the Equal Pay Act, 42 U.S.C. § 1981, or Title VII to the extent they rely on allegations relating to unequal salaries or annual salary increases."). So, as before, the Court need not consider those allegations at summary judgment.

To summarize, the Court is ruling on summary judgment on the following claims. For Douglas's claims, Alfasigma seeks summary judgment on the sex and race discrimination claims (Counts I and III) as they relate to discriminatory bonus payments. Alfasigma also seeks summary judgment on Douglas's hostile-work-environment claim (Count III) and retaliation claim (Count IV) under section 1981.

For Wilson's claims, Alfasigma seeks summary judgment on the discrimination claims under section 1981 (race) and Title VII (race and sex) to the extent that they are based on her discipline, termination, and failure to be promoted. Those claims are Counts I and III.

The company also moves for summary judgment on her hostile-work-environment claim under section 1981 (Count III), and her retaliation claims, under both section 1981 (Count IV) and Title VII (Count V). Finally, the company moves for summary judgment on Wilson's claims of race and sex discrimination that are based on discriminatory bonus payments. Those claims are Counts I, III, and V.

With that background, the Court dives into the facts. The Court begins with some general background about Plaintiffs' jobs at Alfasigma, and then turns to the facts specific to each Plaintiff.

## Facts

### I.     General Factual Background about Alfasigma and the Plaintiffs

This case is about discrimination claims brought by two former employees – both of whom are black females – of Alfasigma USA, Inc., a medical foods producer. Plaintiffs Yah Douglas and Bridget Wilson worked as sales representatives for Alfasigma until 2018. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 72, 100 (Dckt. No. 158). Alfasigma sells "medical foods produced for use under medical supervision in the nutritional management of patients with various medical conditions." *Id.* at ¶ 5.

Both Douglas and Wilson were sales representatives in Alfasigma's "Chicago/Great Lakes West District." *Id.* at ¶¶ 22, 24, 80. They sold Alfasigma's products to doctors in the region by "visiting doctors to discuss prescribing Alfasigma's products, taking samples to doctors' offices, and giving presentations on Alfasigma's products during luncheons." *Id.* at

¶ 25. Sales representatives also were required "to call regularly on health care professionals and support the promotional effort behind [Alfasigma's] products." *Id.* at ¶ 79 (quotation marks omitted).

Douglas and Wilson were supervised by Jeffrey Oliver, a white man, who was the manager of the Chicago/Great Lakes West District. *Id.* at ¶¶ 26, 81; Def.'s Resp. to Pls.' Statement of Additional Facts, at ¶ 2 (Dckt. No. 167). Douglas was on the Great Lakes West team from 2014 until she quit in February 2018 to take a job at a medical device company. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 80, 100 (Dckt. No. 158). Wilson was on the team from 2015 until she was fired in November 2018. *Id.* at ¶¶ 22, 72.

Sales representatives at Alfasigma were assigned a sales "territory," a geographic area defined by zip codes. *Id.* at ¶¶ 108–09. They were expected to sell Alfasigma's products to doctors located within their sales territory. Zip codes were assigned to one sales representative, who was expected to sell to all the doctors in that geographic area. *Id.* at ¶ 110.

Alfasigma sometimes realigned its sales territories. In 2017, the company realigned sales territories by shifting which zip codes were controlled by which sales representative. *Id.* at ¶¶ 123, 132. It hired a third-party contractor, Axtria, to assist with territory realignments. *Id.* at ¶ 122.

When sales territories get realigned, sales goals changed, too. "If a zip code is transferred from one territory to another during a realignment, the goal for that territory changes correspondingly because the sales history for that zip code moves along with the zip code." *Id.* at ¶ 125. That is, a sales representative's sales targets were based on the sales history in their territory.

7

One aspect of setting sales territories, in particular, is a bone of contention in this case. Just like zip codes need to be assigned to sales representatives, doctors need to be assigned to zip codes. For doctors that have a single office, the assignment is straightforward. Sales to that doctor are associated with the zip code where the doctor's one office is located, and the sales representative assigned to that zip code is responsible for those sales. *Id.* at ¶¶ 111–12.

But sometimes a doctor has more than one office. And sometimes those offices are in different zip codes, which are sometimes in different sales territories. In those cases, Alfasigma claims that it "assigns the doctor a 'primary credit address' within the zip code where the doctor spends the majority of his or her work time. All credit for sales to that doctor goes to the sales representative whose territory includes the zip code where the doctor's primary credit address is located." *Id.* at ¶ 113; *see also id.* at ¶ 127; Wilson Dep., at 101:9-17 (Dckt. No. 144-3, at 16 of 155).

That is, determining where a doctor spends most of his or her time can mean big business for a sales representative. It's the difference between getting credit for all the sales to that doctor and getting no credit at all for sales to that doctor.

Getting credit for sales is important because it gets factored into a sales representative's compensation. "As sales representatives, Douglas and Wilson were eligible for quarterly bonuses based on their sales." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 103 (Dckt. No. 158). How bonuses were calculated changed over time, but broadly speaking, bonuses were determined based on performance relative to sales goals within the sales representative's territory. *Id.* at ¶ 117.

"The sales goals for each sales representative differ depending upon their sales territory, because a representative's sales goals are set based on the historical sales within the

representative's territory, as well as the opportunity for sales growth within the territory." *Id.* at ¶ 108. "Alfasigma provide[d] its sales representatives with an incentive compensation plan to lay out the method for determining sales goals and the incentive compensation structure relative to those goals." *Id.* at ¶ 115.

As discussed below, both Douglas and Wilson allege that certain doctors who should have been assigned to their sales territory based on the doctor's primary credit address were in fact assigned to other sales representatives. And they allege that they received lower quarterly sales bonuses as a result.

With that backdrop, the Court turns to facts specific to each Plaintiff.

## II.    Yah Douglas

Douglas's discrimination claims about her bonus payments focus on the assignment of two doctors:  Dr. Zajecka and Dr. Bank.

Start with Dr. Zajecka. After Douglas returned from maternity leave in 2016, she learned that Dr. Zajecka had been assigned to a different sales territory. *Id.* at ¶¶ 128, 131. Alfasigma told Douglas that Dr. Zajecka had been reassigned because he had multiple offices and he spent most of his time in the other territory. *Id.* So, under Alfasigma's policies, sales to Dr. Zajecka were assigned to the territory where he spent the most time.

Douglas wasn't convinced. She contacted Dr. Zajecka's office to nail down where he spent most of his time. *Id.* Douglas ultimately submitted "proof that he spent the majority of his time in [her] territory." *Id.* at ¶ 131. Alfasigma apparently agreed because it then reassigned Dr. Zajecka's sales back to Douglas. *Id.*; *see also* Douglas Dep., at 63:15-22 (Dckt. No. 144-7, at 8 of 125) ("So [Alfasigma] commenced to tell me that they would not give [Dr. Zajecka] back to me unless I had proof from the office, to which I called the office manager who knew me very

well, and I explained the situation. I said can you please send an email to my work email so I can forward it to corporate so that they can do the correct assignment of the doctor. And so finally they were able to reassign the doctor back to me.").

The record isn't clear on how long Dr. Zajecka's sales were assigned to a different sales territory. And the record doesn't show which sales representative's territory Dr. Zajecka was assigned to, though Douglas testified that it was to "one of the white males on the team." *See* Douglas Dep., at 63:9-10 (Dckt. No. 144-7, at 8 of 125).

Douglas also points to the reassignment of Dr. Bank in 2017. Here, Bank's reassignment wasn't based on having multiple offices. Instead, the entire zip code where Bank's office was located was reassigned to a different sales representative during the 2017 territory realignment. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 132 (Dckt. No. 158). In her deposition, Douglas testified that she agreed that "all of the physicians that were in [Dr. Bank's] zip code were transferred at the same time." *See* Douglas Dep., at 69:18-21 (Dckt. No. 144-7, at 10 of 125).

Once again, the record is silent on which sales representative took over Dr. Bank's zip code. But this time, there is nothing in the record indicating the representative's race or sex.

Next, Douglas's hostile-work-environment claim is based on a single text exchange from late 2017. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 82–88 (Dckt. No. 158). Sometime before Christmas, Douglas sent some of her co-workers, including Oliver, a text message with a picture of her young son crying on Santa's lap. *Id.* at ¶¶ 83, 85. She then asked her colleagues if they had "any other Santa pics out there to share." *Id.* at ¶ 83 (cleaned up).

Jim McNeil, a white sales representative who also reported to Oliver, responded "I would but my son is 31 now." *Id.* at ¶¶ 82, 84. Douglas responded, "Hahaha Jim. He's never too old to sit on Santa's lap." *Id.* at ¶ 84.

A bit later Oliver responded, "I'd like to see JIM in his business suit sitting on Santa's lap . . . now that would really crack us up." *Id.* at ¶ 85 (alteration in original). Douglas apparently agreed that seeing McNeil on Santa's lap would be a humorous sight. She responded, "Hahaha!" *Id.*

But from Douglas's perspective, things went off the rails after that. McNeil responded to her text by saying, "I'd probably get a Bad Santa, knowing my luck." *Id.* at ¶ 86. That written message was followed by seven emojis: a Christmas tree, a black Santa Claus, eyeballs looking off to the right, a billiards eight ball, two cigarettes, and another Christmas tree. *Id.*

After another coworker said that McNeil's message was funny, he sent another text message. This one began with three emojis: a black Santa Claus followed by two Christmas trees. *Id.* McNeil then wrote, "HO HO HO, Stick em up Jimmy !!" followed by three more emojis: a black Santa Claus, a green gun, and a stack of cash with wings. *Id.*

Douglas then responded with five emojis of her own. Her response seems to indicate that she found McNeil's text funny. Her text included three laughing emojis and two crying laughing emojis. *Id.*

Unfinished, McNeil ended the exchange with a nine-emoji text: a Christmas tree, a smiling face, a surprised face, two more Christmas trees, a black Santa Claus, and three sparks. *Id.*

Whatever Douglas thought of McNeil's texts at the time, she later soured on them. Douglas testified that she did not receive McNeil's emojis on her cellphone. *Id.* at ¶ 87. Only

11

later did she see the emojis when a co-worker sent her screenshots of the emojis and "told Douglas she believed the Black Santa emoji was racist." *Id.*

Here's part of the text thread:



*Id.* at ¶ 86.

Finally, Douglas's retaliation claim under section 1981 is based on her allegedly reporting race discrimination that occurred when Alfasigma calculated her yearly base pay increase. (As an aside, this claim is based on Douglas's base salary, not her bonuses, which are the subject of the rest of Alfasigma's partial summary judgment motion.) Douglas alleges that in 2015 she was entitled to 4–6% increase in her base pay. *See* 6/17/21 Mem. Opin. & Order, at 11 (Dckt. No. 86). Instead, she claims that she got only a 1.75% raise. *Id.*

12

She then alleges that she complained to Human Resources, telling them that Oliver had discriminated against her because of her race when giving her a raise that was lower than merited by her performance. *Id.* This HR complaint led Oliver to retaliate against Douglas when calculating raises for 2016. Douglas alleges in the second amended complaint that she was entitled to a raise of 2–4.99%, but instead received only a 1.5% raise. *Id.*

After discovery, a different picture emerged. It is undisputed that in 2016 Douglas received a 3% raise, not a 1.5% raise. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 95 (Dckt. No. 158). So, the allegations in the complaint tell a different story than the evidence.

## III.   Bridget Wilson

The Court now turns to facts specific to Plaintiff Wilson's claims.

Alfasigma hired Wilson in November 2015. *Id.* at ¶ 22. She had a rocky first year.

Wilson had a series of performance issues in 2016. *Id.* at ¶ 28. In November 2016, Alfasigma gave her a written warning for a range of policy violations, including failing to return a company iPad, leaving the sales territory without permission, entering inventory reports late, submitting expense reports late, failing to record paid vacation time, and expensing sales meals in violation of company policy. *Id.* at ¶¶ 28–29. Wilson acknowledged this warning and agreed that she was committed to improving her performance. *Id.* at ¶ 30.

Wilson's performance issues resurfaced by late 2017. Wilson was notified that she failed to comply with Alfasigma's policies on keeping track of product samples in late 2017 and early 2018, "which was a reportable offense to the Food and Drug Administration." *Id.* at ¶ 36. She also did not notify Oliver that she would be out of the office on days in January – March 2018. *Id.* And she failed to provide product samples to a doctor in her sales territory despite receiving four requests from the doctor's office manager. *Id.* at ¶ 37.

13

So, Alfasigma placed Wilson on a Performance Improvement Plan ("PIP") in July 2018. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 158). She had a few other performance issues after that point, too. She again misplaced a company iPad. *Id.* at ¶ 43. She also charged a car rental to her corporate credit card when the rental was for personal use. *Id.* at ¶¶ 45–47.

Alfasigma fired Wilson on November 1, 2018. *Id.* at ¶ 72. Oliver told her that she "was not a good fit." *See id.*; *see also* Wilson Dep., at 148:14-17 (Dckt. No. 144-3, at 48 of 155).

Before being fired, Wilson expressed interest in applying for district manager positions at other Alfasigma locations. To interview for a district manager position, Wilson needed Oliver's permission as her direct supervisor. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 61, 67 (Dckt. No. 158). But she never got Oliver's permission. *Id.*

Wilson was interested in applying for a district manager position three times. *Id.* at ¶ 61. These three positions were filled in June 2017, August 2017, and June 2018. *Id.* at ¶¶ 63–65. Oliver permitted Jeff Bowen (a white man) and another male employee to interview for these positions, but they weren't hired. *See* Wilson Dep., at 182:6-22 (Dckt. No. 144-3, at 59 of 155). Wilson admits that "none of the sales representatives in her district were hired for any of these District Manager positions, and that she [does] not know the names or qualifications of any of the individuals ultimately hired for these positions." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 62 (Dckt. No. 158).

Wilson's hostile-work-environment claim is based on run-ins with Bowen, the colleague who was permitted to interview for the district manager jobs. She claims that Bowen swore at her, including by using the f-word, twice, once in 2016 and once in 2018. *See id.* at ¶¶ 51, 53–55. In 2016, Bowen said the f-word to Wilson when asking her for driving directions; in 2018,

14

he told Wilson "where the [f-word] were you?" when she arrived to a podiatry conference 20 minutes late. *Id.* These were the only two instances that Wilson recalls Bowen swearing. *Id.* at ¶ 55.

Bowen also once hung up on Wilson after she called him about getting product samples to a doctor. *Id.* at ¶ 58.

Finally, she claims that Bowen once "bragged about having a gun in his car at all times" and stated, "I take my gun with me when I go into doctors' offices in the ghetto." *Id.* at ¶ 60.

Wilson complained to Alfasigma's Human Resources about some of Bowen's conduct. She complained to Oliver that Bowen swore at her when asking for directions in 2016. *Id.* at ¶¶ 51–52. She complained about Bowen's conduct at the podiatry conference in 2018. *Id.* at ¶ 56. And she complained about Bowen hanging up on her, too. *Id.* at ¶ 59. But Wilson admits that she never complained about Bowen bragging about bringing a gun into the ghetto. *Id.* at ¶ 60.

Wilson's bonus-based discrimination claims are based on not receiving credit for sales to certain doctors.

Wilson claims that her bonuses were lower because "Oliver reassigned high volume and high-income zip codes in the middle of [an] ostensibly exclusive geographic area of contiguous zip codes." *See* Wilson Resp., at 8 (Dckt. No. 160) (quoting Wilson Dep., at 177:8-18).

Wilson also testified that she did not receive credit for sales to doctors that were in her sales territory. *See* Wilson Dep., at 179:4-7 (Dckt. No. 162-2, at 24 of 56). As a result of territory realignment, Wilson claims that she did not receive credit for sales to seven doctors. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 133 (Dckt. No. 158). She claims that Jim

McNeil, a white man, received credit for sales to these doctors instead. *See* Wilson Dep., at 179:10-17 (Dckt. No. 162-2, at 24 of 56).

Specifically, Wilson testified that McNeil received credit for sales to Dr. Jabber who was located within her territory. *Id.* at 100:5 – 101:8. She testified that Dr. Jabber spent the majority of his time, "at least three days a week," in her territory. *Id.* at 100:16-20.

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving her the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

16

## Analysis

The Court will take each Plaintiff's claims one at a time, starting with Douglas and finishing with Wilson.

### I.    Douglas

As discussed, Alfasigma moves for partial summary judgment on four of Douglas's claims.  First, the company contends that Douglas's bonus payments were not discriminatory on the basis of sex under the Equal Pay Act (Count I).  Second, it makes the same argument about Douglas's bonus payments when addressing the race discrimination claim under section 1981 (Count III).  Third, Alfasigma seeks summary judgment on Douglas's hostile-work-environment claim (Count III) under section 1981.  And fourth, the company seeks summary judgment on Douglas's retaliation claim (Count IV), also under section 1981.

The Court begins by analyzing the claims that the bonus payments were discriminatory.  Then it considers the hostile-work-environment and retaliation claims under section 1981.

The upshot is that Alfasigma is entitled to summary judgment on all fronts.

Before jumping into the analysis, a quick note about the legal standards.  The prima facie elements of claims under section 1981 and Title VII are "essentially identical."  *See Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012); *see also Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007).  So, the Court considers cases about Title VII when analyzing section 1981 claims, and vice versa.

### A.    Discriminatory Bonus Payments (Counts I and III)

The Court begins with Douglas's claims that Alfasigma discriminated against her on the basis of her sex (Count I) and race (Count III) when it paid her bonuses.  Douglas brings her sex-based claims under the Equal Pay Act, and her race-based claims under section 1981.

Douglas's underlying allegations are the same under both statutes. She claims that Alfasigma improperly assigned sales to Dr. Zajecka to a zip code in a white man's sales territory. And she says that Dr. Bank's zip code was reassigned during a territory realignment. But to whom is a mystery.

### 1. Equal Pay Act (Count I)

The Equal Pay Act prohibits sex-based discrimination in the workplace. *See* 29 U.S.C. § 206(d)(1). It "forbids paying workers of one sex less than workers of the opposite sex for equal work that requires equal skill, effort, and responsibility, unless the pay differential is justified by factors other than sex, such as seniority, merit, experience, or education." *Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000). To succeed on an Equal Pay Act claim, a plaintiff must establish "(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 912–13 (7th Cir. 2002) (quotation marks omitted).

If the plaintiff establishes a prima facie case under the Equal Pay Act, then "the burden of persuasion shifts to the employer to prove that the disparity is justified by one of four affirmative defenses: (1) a merit system; (2) a seniority system; (3) a system which measures earnings by quantity or quality of production; and (4) a differential based on any factor other than sex." *Kent v. City of Chicago*, 814 F. Supp. 2d 808, 819 (N.D. Ill. 2011) (quoting *Howard*, 234 F.3d at 1004–05).

"The fourth affirmative defense (any other factor other than sex) is a broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Reiff v. Bd. of Regents of the Univ. of Wis. Sys.*, 2014 WL 4546041, at *9 (W.D. Wis.

2014) (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1211 (7th Cir. 1989)). That is, "as long as each pay discrepancy is explained by some factor other than sex, the [defendant] is entitled to summary judgment." *Kent*, 814 F. Supp. 2d at 819.

Douglas's Equal Pay Act claim fails at the first step of the prima facie case. She hasn't put forward evidence to show that male sales representatives at Alfasigma received higher bonus payments than female sales representatives.

Start with her claims about Dr. Zajecka. She says that the zip code snafu led Dr. Zajecka's sales to be assigned to the territory of a white male sales representative. *See* Douglas Dep., at 63:9-10 (Dckt. No. 144-7, at 8 of 125).

But noticeably absent is any evidence that the white sales representative earned a larger bonus than Douglas. After all, Dr. Zajecka was ultimately reassigned to Douglas's sales territory. Douglas doesn't present any evidence showing that her bonus was smaller because of the mix-up. And she doesn't present any evidence showing that men generally received larger bonuses than women, either.

That's a problem because "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 851 (7th Cir. 2005) (quotation marks omitted).

Without any evidence that the Dr. Zajecka assignment cost Douglas bonus money that went to a man, Douglas hasn't presented sufficient evidence for a prima facie case.

Douglas's allegations about Dr. Bank fare even worse. She claims that Dr. Bank's zip code – not just Dr. Bank's sales – was reassigned during a 2017 territory realignment. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 132 (Dckt. No. 158). But there's nothing in the record

showing that this zip code realignment led Douglas to receive a lower bonus. And there's nothing in the record showing which sales representative – male or female – was assigned Dr. Bank's zip code after the realignment. So, there's no way of knowing that Alfasigma paid different bonus amounts to male and female sales representatives.

In fact, Douglas's only evidence on this front is a single page of her deposition testimony, which she repeatedly cites when responding to Alfasigma's Rule 56.1 statement of facts. *Id.* at ¶¶ 106–07, 110–13, 115–16, 118–19, 121, 127. But Douglas's testimony simply describes how Dr. Zajecka was initially assigned to the zip code of "one of the white males on the team" before Alfasigma was "able to reassign the doctor back to" Douglas. *See* Douglas Dep., at 63:1-24 (Dckt. No. 144-7, at 8 of 125). It doesn't provide any evidence that men received higher bonus payments than women.

Without any evidence that the reassignments led to bonus differentials, no reasonable jury could find for Douglas on her Equal Pay Act claim. Alfasigma is entitled to summary judgment on Douglas's Equal Pay Act claim about bonus payments.

## 2. Section 1981 (Count II)

Turning to race discrimination, when ruling on a race discrimination claim at summary judgment, the Court considers "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021).

Traditionally, a plaintiff has two routes to prove discrimination. One option is the direct method. "A plaintiff proceeds under the direct method of proof by showing 'either direct or

circumstantial evidence of intentional racial discrimination.'" *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

Another route to prove discrimination is the indirect method, meaning the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that approach, "the plaintiff has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If the plaintiff establishes those elements, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (cleaned up).

In recent years, the Seventh Circuit has pivoted away from a strict divide between the direct method and the indirect method, and has moved toward a more holistic approach. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz*, 834 F.3d at 765.

Douglas notes the distinction between direct and indirect evidence, and then focuses on indirect evidence claims under *McDonnell Douglas*. *See* Douglas Resp., at 5 (Dckt. No. 159) ("At the very least, Plaintiff has presented sufficient indirect evidence for her claims."). So, the Court will too.

The analysis here largely mirrors the analysis of Douglas's Equal Pay Act claim. Douglas hasn't established a prima facie case of race discrimination because she hasn't

introduced evidence showing that she suffered an adverse employment action. And she hasn't identified comparable non-black employees who were paid more.

True, receiving less compensation – here, lower bonuses – because of race could constitute an adverse employment action. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2003). But Douglas hasn't presented any evidence to support that claim.

Start with her allegations about Dr. Zajecka. Douglas hasn't presented any evidence that she lost bonus money because of Dr. Zajecka's temporary assignment to a different sales representative. And she does not even say which employee received credit for Dr. Zajecka's sales before he was transferred back to her sales territory.

To establish a prima facie case of discrimination based on disparate pay, Douglas would need to provide evidence of her bonus payments, and the payments of her comparators, during the relevant bonus period. *Id.* She hasn't done so.

The same is true for her allegations about Dr. Bank. Douglas hasn't presented evidence that the 2017 realignment led her to receive a lower bonus, while similarly situated non-black employees received a higher bonus. She hasn't even presented evidence of which sales representative Dr. Bank's zip code was assigned to. And she hasn't presented evidence of the representative's race, either.

Alfasigma is entitled to summary judgment on Douglas's section 1981 discrimination claim about the bonus payments.

## B.    Hostile Work Environment Under Section 1981 (Count III)

Next, Douglas brings a hostile-work-environment claim under section 1981 (Count III) based on the series of offensive text messages that she received from McNeil in 2017. No

reasonable jury could find that these comments were frequent enough, or severe enough, to constitute a hostile work environment.

To survive summary judgment on a hostile-work-environment claim, a plaintiff must provide "sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

In assessing "whether remarks objectively create a hostile work environment [courts] must assess the frequency of their use, as well as whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand." *Dandy*, 388 F.3d at 271 (cleaned up). "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920. That is, both the frequency and the severity of the comments count when determining whether conduct created a hostile work environment. *See Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022).

Additionally, "'offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Dandy*, 388 F.3d at 271 (quoting *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998)). "Insults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance." *Brooks*, 39 F.4th at 441.

Even if the Court does not "condone" a defendant's behavior "occasional vulgar language, and coarse, rude, or boorish behavior will not amount to a hostile work environment." *Id.*

The Court begins by drawing the inference, in Douglas's favor, that McNeil's text messages were racially offensive. McNeil responded to a joke about him sitting on Santa's lap by saying, "I'd probably get a Bad Santa, knowing my luck." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 86 (Dckt. No. 158). McNeil, who is white, then included emojis of a black Santa Claus, googly eyes, and two cigarettes. *Id.*

When a coworker told him this message was funny, McNeil then responded with "HO HO HO, Stick em up Jimmy !!," two more black Santa Claus emoji, a gun emoji, and a flying money emoji. *Id.* And he finished the texts off with another series of emojis that also included a black Santa, and three sparks or explosions. *Id.*

McNeil's version of "Bad Santa" seems to be inclined toward armed robbery. So, maybe McNeil was implying that if he were to be robbed by a Santa Claus, it would be by a black person playing Santa, not a white person. He may have been drawing on the pernicious stereotype of black people as more likely to commit crimes than people of other races. And while McNeil may have been referencing the movie *Bad Santa*, where actor Billy Bob Thornton plays a Santa who robs shopping malls, neither Thornton nor McNeil is black. So, McNeil's choice of the black Santa Claus emoji, in response to Douglas's text asking for pictures of Santa, could have been perceived as racially offensive.

But even if McNeil's three text messages are racially offensive, they fall short of creating a hostile work environment. For starters, they were infrequent. McNeil sent three texts, in a single text thread, that may have referenced a black Santa Claus who commits armed robbery.

24

That's not enough for a reasonable jury to find that the working environment at Alfasigma was racially hostile. The Seventh Circuit has typically required more than an isolated instance of offensive conduct to state a claim for a hostile work environment. *See Boss*, 816 F.3d at 920–21 (collecting cases in which a single racial slur was not sufficient to go to the jury on the plaintiff's racial discrimination hostile-work-environment claim).

McNeil's messages, even if offensive, weren't particularly severe, either. His comments weren't directed at Douglas specifically. And they referenced race only indirectly, by using black Santa Claus emojis.

The text messages weren't "physically threatening or humiliating," but instead fall on the "mere offensive utterance" side of the line. *Id.* at 921. Douglas is complaining about "non-threatening, non-humiliating conduct in the form of a comment that could have been construed as racial." *Id.* That's not enough to support a claim at the summary judgment stage.

McNeil's text messages may have been "juvenile, insulting, and boorish, but no reasonable jury could find that they were so frequent or pervasive as to create a hostile work environment." *Brooks*, 39 F.4th at 442.

Douglas points out that the Seventh Circuit has held that "[o]ne instance of conduct that is sufficiently severe may be enough" for a plaintiff to succeed on a hostile-work-environment claim. *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). She points to a decision where the Seventh Circuit considered (without deciding) whether a black employee who found a noose in his locker could succeed on a hostile-work-environment claim. *See Cole v. Board of Trustees of Northern Illinois University* 838 F.3d 888, 896–97 (7th Cir. 2016).

Douglas's analogy is way off. McNeil's texts don't rise to the level of finding a noose in your locker at work. Not even close. For starters, finding a noose is threatening conduct that's

directed at the plaintiff.  A noose is a threat of physical violence.  And it's especially severe harassment "[g]iven the status of the hangman's noose as a visceral symbol of the deaths of thousands of African–Americans at the hand of lynch mobs." *Id.* at 897 (quotation marks omitted).  A noose is a symbol of physical violence with clear racial overtones.

McNeil's black Santa Claus emojis, on the other hand, were more subtle and less offensive than a noose.  To be sure, Douglas encountered offhand comments that could be perceived as racially offensive, rude, and hurtful.  But she hasn't pointed to the kind of one-off conduct that is severe enough to show that the workplace was racially hostile.  A noose and a Black Santa aren't in the same league.

Alfasigma is entitled to summary judgment on Douglas's hostile-work-environment claim under section 1981 (Count III).

## C.    Retaliation Under Section 1981 (Count IV)

Finally, Douglas brings a retaliation claim under section 1981 (Count IV).  She alleges that when she complained to HR about Oliver's race discrimination when setting her 2015 yearly raise, Oliver retaliated by giving her a lower-than-deserved raise in 2016, too.  *See* 6/17/21 Mem. Opin. & Order, at 11 (Dckt. No. 86).

Like discrimination, a plaintiff can prove retaliation through the direct or indirect method.  The direct method requires a plaintiff to show that "(1) he engaged in protected activity, (2) he suffered a materially adverse employment action, and (3) there was a causal link between his protected activity and the adverse action."  *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 862 (7th Cir. 2015).

Under the indirect method, a plaintiff must show that "(1) he engaged in protected activity, (2) he suffered a materially adverse employment action, (3) he was meeting his

employer's legitimate expectations, and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id.* At that point, "the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination." *Id.* (cleaned up).

The Court begins not with the elements of a retaliation claim, but with Douglas's waiver. Despite Alfasigma moving for summary judgment on her retaliation claim, Douglas doesn't address retaliation in her response to the motion for summary judgment. *See* Douglas Resp.(Dckt. No. 159). Retaliation is mentioned only once, in setting out the legal elements needed "[t]o survive summary judgment on her retaliation claim." *Id.* at 5.

After setting out the legal standard, Douglas doesn't say another word about retaliation, or about the factual allegations that formed the basis for her claim. That is, her allegation that she received a 1.5% raise in 2016 instead of a 2–4.99% raise because she complained to HR about race discrimination receives no airtime in the response.

In light of this failure to respond, the Court finds that Douglas has waived her retaliation claim under section 1981. *See Aberman v. Bd. of Educ.*, 2014 WL 4912139, at *2 (N.D. Ill. 2014) ("Because Plaintiff did not address Defendants' arguments in her response to the motion to dismiss, she has waived these claims.") (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011)).

Douglas's decision to waive her retaliation claim isn't surprising. The only evidence in the record *disproves* her allegations. Douglas alleges that she was entitled to a 2–4.99% salary increase in 2016. But she admitted during discovery that she received a 3% raise, not the 1.5%

27

raise she alleged in the second amended complaint. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 95 (Dckt. No. 158).

So, even assuming that Douglas's complaints to HR were protected activity (a point Alfasigma disputes), the Court struggles to see how getting a raise within the appropriate range based on her performance is a materially adverse employment action. *See Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 382–83 (7th Cir. 2020) (discussing materially adverse actions in retaliation claims). The employer's retaliatory action must have been "such that a reasonable employee would have been deterred from making or supporting an investigation of discrimination." *Id.* Getting a within-range raise (and a raise that's 1% above the lower bound of the range at that) doesn't come close.

So, even setting waiver aside, Douglas's retaliation claim fails on the merits. The undisputed evidence shows that she never experienced a materially adverse employment action because she received a wage increase that was squarely within the range she claims that she deserved.

Alfasigma is entitled to summary judgment on Douglas's retaliation claim under section 1981.

## II.   **Wilson**

The Court now turns to Alfasigma's motion for partial summary judgment on Wilson's claims (Dckt. No. 142).

As discussed, Alfasigma moves for partial summary judgment on seven of Wilson's claims. First, it seeks summary judgment on Wilson's discrimination claims under section 1981 (Count III) and Title VII (Count V) to the extent that they are based on Wilson's discipline, termination, and failure to be promoted. Second, it seeks summary judgment on Wilson's

hostile-work-environment claim under section 1981 (Count III). Third, it contends that Wilson did not experience retaliation for engaging in protected activity under section 1981 (Count IV) or Title VII (Count V). Fourth, it argues that Wilson's bonus payments were not discriminatory on the basis of either sex or race under the Equal Pay Act (Count I), section 1981 (Count III), or Title VI (Count V).

The Court will take up the claims in that order.

The punch line is that Alfasigma is entitled to summary judgment on all of Wilson's claims, except for the claims about discriminatory bonuses. And even then, Alfasigma is entitled to summary judgment on Wilson's claims under Title VII for bonuses that were paid before March 27, 2018, because those claims are time barred.

## A. Discrimination Under Section 1981 (Count III) and Title VII (Count V)

Wilson alleges that she was discriminated against because of her race in violation of section 1981 and Title VII, and that she was discriminated against because of her sex in violation of Title VII. The claims rely on two adverse employment actions: her discipline and termination in 2018, and Oliver's decisions to not allow her to interview for district manager positions.

The Court takes each theory in turn.

### 1. Wilson's Termination

Wilson contends that she was discriminated against when Alfasigma fired her in November 2018. *See* Wilson Resp., at 5–7 (Dckt. No. 160). Like Douglas's discrimination claims, Wilson proceeds under the *McDonnell Douglas* burden-shifting framework. *Id.* at 5 ("At the very least, Plaintiff has presented sufficient indirect evidence for all her claims."). So, the Court will too.

As discussed, Wilson had a series of performance issues in 2016. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 28 (Dckt. No. 158). In November 2016, Alfasigma gave her a written warning for a range of company policy violations. *Id.* at ¶¶ 28–29.

Wilson's performance issues resurfaced by late 2017. Wilson was notified that she failed to comply with Alfasigma's policies on keeping track of product samples in late 2017 and early 2018, "which was a reportable offense to the Food and Drug Administration." *Id.* at ¶ 36. She also did not notify Oliver that she would be out of the office on days in January – March 2018. *Id.* And she failed to provide product samples to a doctor in her sales district despite receiving four requests from the doctor's office manager. *Id.* at ¶ 37.

So, Alfasigma placed Wilson on a PIP in July 2018. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 158). She had a few other performance issues after that, too.

Alfasigma fired Wilson on November 1, 2018. *Id.* at ¶ 72. Oliver told her that she "was not a good fit" at Alfasigma. *See id.* at ¶ 72; *see also* Wilson Dep., at 148:14-17 (Dckt. No. 144-3, at 48 of 155).

Alfasigma contends that Wilson hasn't established a prima facie case of discrimination because she hasn't presented evidence that she was meeting its legitimate employment expectations. It also argues that Wilson has not shown that its performance-based reasons for firing Wilson were pretextual.

When the employer's nondiscriminatory reason for the adverse action is that the employee was not meeting its legitimate employment expectations, then the question of "legitimate expectations and pretext overlap." *See Brooks*, 39 F.4th at 435. In these cases, the court can consider legitimate employment expectations and pretext together "rather than first

determining whether there is a prima facie case of discrimination and then turning to pretext." *Id.*

"Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) (quotation marks omitted). "If the employer honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Illinois Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022).

"In determining whether the employer's reason can be characterized as pretextual, [the court does] not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. [Its] sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020).

So, the question isn't whether Wilson actually had performance issues. The question is whether Alfasigma honestly believed that Wilson was having performance issues and fired her for that reason.

At summary judgment, it is the plaintiff's burden "to produce evidence that would allow a reasonable jury to find that [the defendant's] justification was pretextual." *See*, 29 F.4th at 368.

Here, Alfasigma has pointed to Wilson's performance issues, which span from 2016 through 2018, as the nondiscriminatory reason for firing her. It has pointed to evidence showing that Wilson experienced performance issues during this period, including after she was placed on a PIP.

Wilson, on the other hand, has not carried her burden to present evidence that Alfasigma's reason was pretextual. She hasn't presented any evidence showing that the stated

reason for her termination – her persistent and documented performance issues – was a smokescreen for discrimination.

Instead, Wilson argues that Alfasigma's reason was pretextual because its story has changed. Oliver told her that she was being fired because she wasn't a good fit for the company, while Alfasigma now argues during litigation that Wilson was fired for documented performance issues. *See* Wilson Resp., at 6–7 (Dckt. No. 160).

True, "[s]hifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *McCann v. Badger Mining Corp.*, 965 F.3d 578, 589–90 (7th Cir. 2020) (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003)).

There's no reason to think that Alfasigma's explanation for Wilson's firing was shifting or inconsistent. Wilson had a long history of performance issues during her tenure at Alfasigma. And Oliver's statement that she "wasn't a good fit" at the company is relatively generic. It's not inconsistent with the belief that Wilson wasn't a good fit *because* of her documented performance issues. Perhaps they were letting her down easy.

Moreover, Wilson was aware that Alfasigma viewed her performance as subpar. She was given a written warning in November 2016, notified of further issues in April 2018, and placed on a PIP in July 2018. Alfasigma didn't exactly spring complaints about performance issues on Wilson out of the blue. Alfasigma didn't change its tune when it explained why it fired Wilson – it had been telling her the same thing all along.

Wilson also claims that she was performing up to Alfasigma's expectations in 2017. *See* Def.'s Reply Brief as to Wilson, at 9 n.4 (Dckt. No. 168). So, she claims that firing her for performance issues in 2018 tends to show pretext. That's not quite right. Pointing to a positive

work history, standing alone, isn't enough to demonstrate pretext. *See Adebiyi v. S. Suburban Coll.*, 2022 WL 3139564, at *12 (N.D. Ill. 2022) (citing *Igasaki*, 988 F.3d at 959). And whatever positive work history Wilson had, Alfasigma has pointed to evidence that she performed poorly, too.

Finally, Alfasigma argues that Wilson hasn't presented any evidence of a similarly situated sales representative, not in her protected class, who was treated more favorably. The company is right. There is nothing in the record showing that a male or non-black sales representative with comparable performance issues was not terminated. Without that evidence, she cannot satisfy step four of the prima facie case. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014).

In sum, Alfasigma is entitled to summary judgment on Wilson's claims under section 1981 (Count III) and Title VII (Count V) to the extent that they are based on her termination.

### 2. Failure to Promote Wilson

Wilson also argues that Alfasigma discriminated against her when Oliver did not permit her to interview for district manager positions in Michigan, Seattle, and Arizona. Unsurprisingly, she wasn't promoted to these positions after she didn't get the opportunity to interview.

To interview for a district manager position, Wilson needed Oliver's permission as her direct supervisor. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 61, 67 (Dckt. No. 158). Wilson was interested in applying for a district manager position three times. *Id.* at ¶ 61. These three positions were filled in June 2017, August 2017, and June 2018. *Id.* at ¶¶ 63–65. Oliver permitted Bowen and another male employee to interview for these positions, but they weren't hired. *See* Wilson Dep., at 182:6-22 (Dckt. No. 144-3, at 59 of 155). Wilson admits that "none

of the sales representatives in her district were hired for any of these District Manager positions, and that she [does] not know the names or qualifications of any of the individuals ultimately hired for these positions." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 62.

A failure to promote can be an adverse employment action for a discrimination claim. *See Wince v. CBRE, Inc.*, 2022 WL 715456, at *14 (N.D. Ill. 2022). "To demonstrate a *prima facie* case for failure to promote, a plaintiff must produce evidence showing that: (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016). Wilson needs to come "forward with sufficient evidence that the company promoted someone who was not better qualified." *Wince*, 2022 WL 715456, at *14.

Alfasigma argues both that Wilson was not qualified for the positions that she sought, and that the people ultimately promoted to the positions were better qualified than Wilson. *See* Def.'s Mem. in Support of Mtn. for Summ. J. as to Wilson, at 7–8 (Dckt. No. 143). The Court agrees.

For starters, Wilson didn't introduce evidence that she was qualified for the district manager positions. "If the plaintiff was not qualified for any reason, then [he] falls short of establishing a prima facie case and there is no inference of discrimination." *Gross v. Peoples Gas Light & Coke Co.*, 2022 WL 4599369, at *17 (N.D. Ill. 2022) (alteration in original) (quoting *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998)).

Here, the undisputed evidence paints a picture of Wilson's admitted performance issues in 2016, just before Alfasigma filled two of the roles. And Wilson had no prior experience as a

34

sales manager, the role to which she wanted to apply. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 65 (Dckt. No. 158).

During 2016, Wilson was given a written warning for a range of policy violations, including failing to return a company iPad, leaving the sales territory without permission, entering inventory reports late, submitting expense reports late, failing to record paid vacation time, and expensing sales meals in violation of company policy. *See id.* at ¶ 28. She was given a final written warning for these violations in November 2016. *Id.* Wilson didn't receive a raise in 2017 based on her 2016 performance. *Id.* at ¶ 31.

Wilson experienced more performance issues in April 2018. She failed to comply with Alfasigma's policies on keeping track of product samples, "which was a reportable offense to the Food and Drug Administration." *Id.* at ¶ 36. And she failed to provide product samples to a doctor in her sales district despite receiving four requests from the doctor's office manager. *Id.* at ¶ 37.

So, it is not much of a surprise that Wilson wasn't permitted to interview for district manager positions that were filled less than one year after these incidents. Getting poor performance evaluations is consistent with not being promoted. *See Dandy*, 388 F.3d at 274 (affirming summary judgment on a failure-to-promote claim where the plaintiff's "managers consistently stated that she was not ready for promotion"). And Wilson couldn't identify any employee that had been promoted within one year of receiving a written performance warning. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 71 (Dckt. No. 158). Wilson hasn't introduced evidence to the contrary.

Next, Wilson hasn't presented any evidence showing that the employer filled the district manager roles with someone outside of her protected class who was less qualified. She testified that she didn't know who filled the positions, or what qualifications they had. *See id.* at ¶ 62.

However, Alfasigma introduced evidence showing that two of the positions – filled in June and August 2017 – were filled by white men who had prior experience as a regional or district sales manager. *Id.* at ¶¶ 63–64. Brian Mason, who took the district manager job in Seattle in June 2017, had previously been a regional sales manager at Sigma-Tau. *Id.* at ¶ 63. When Sigma-Tau merged with Alfasigma, Mason "retained his position as a Regional Sales Manager" and was then selected to fill the district manager position. *Id.*

Alfasigma selected Matthew Carlton to fill the district manager job in Michigan in August 2017. *Id.* at ¶ 64. He had seven years of experience as a district manager at Shionogi Inc., before being hired. *Id.*

Finally, Alfasigma hired another white man, Aaron Scott, in June 2018 to fill the district manager position in Arizona. *Id.* at ¶ 65. Scott had been employed as a sales consultant at Alfasigma since 1998. *Id.* Wilson, meanwhile, joined Alfasigma in 2015. *Id.* at ¶ 22. So, out of the gate, Wilson cannot show that Alfasigma "jump[ed] the line" when hiring Scott. *Wince*, 2022 WL 715456, at *14.

Wilson argues that it is irrelevant who Alfasigma ultimately hired because her "claim is based on the denial of the opportunity to even try for a promotion." *See* Wilson Resp., at 11 (Dckt. No. 160). But whether Wilson was never interviewed for the promotion, or interviewed and not hired, she still needs to present evidence that Alfasigma ultimately promoted someone who was not better qualified. Otherwise, she hasn't met her burden to establish a prima facie case of discrimination.

36

In sum, Wilson hasn't presented sufficient evidence to support a jury verdict in her favor that she was passed over for promotions because of her sex or race. Alfasigma is entitled to summary judgment on Wilson's claims under section 1981 (Count III) and Title VII (Count V) to the extent that they are based on a failure to promote.

### B.    Hostile Work Environment Under Section 1981 (Count III)

Next, Wilson brings a hostile-work-environment claim under section 1981 (Count III). Her claim is based on run-ins with a colleague, Jeff Bowen. She claims that Bowen swore at her, including by using the f-word, twice, once in 2016 and once in 2018. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 51, 53–55 (Dckt. No. 158). These were the only two instances that Wilson recalls Bowen swearing. *Id.* at ¶ 55.

Bowen also once hung up on Wilson after she called him about getting product samples to a doctor. *Id.* at ¶ 58.

Finally, she claims that Bowen once "bragged about having a gun in his car at all times" and stated, "I take my gun with me when I go into doctors' offices in the ghetto." *Id.* at ¶ 60. The second amended complaint alleged that this statement was not made to Wilson directly, and the evidence doesn't show anything different. *See* 6/17/21 Mem. Opin. & Order, at 10–11 (Dckt. No. 86).

The same analysis applies to Wilson's claims as applied to Douglas's claims. So, the Court draws on the cases and law that that have already been discussed. And the outcome is the same, too. Wilson has not presented evidence of offensive comments that were frequent enough, or severe enough, to constitute a hostile work environment.

Start with Bowen's use of the f-word and decision to hang-up on Wilson. For starters, none of these incidents are related to Wilson's race. That's a problem because to succeed on a

section 1981 claim she must show that the harassment was based on her race. *See Dandy*, 388 F.3d at 271 ("To be actionable under § 1981, harassment must be: (1) based on race . . . ."). Swearing at work and hanging up on a colleague is inappropriate, but Wilson hasn't presented any evidence showing that Bowen's conduct was related to her race.

What's more, "[i]nsults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance." *Brooks*, 39 F.4th at 441.

As *A Christmas Story* put it, the f-word is the queen mother of dirty words. Maybe so. But even if that's true, the Seventh Circuit has held that having the f-word directed at you on occasion isn't enough to state a claim for a hostile work environment. *Id.* at 432, 441. It generally falls on the boorish behavior side of the line unless it's pervasive or severe.

Here, Bowen used the f-word only twice, and the incidents took place two years apart. That's not enough to create a hostile work environment. *Id.*

Bowen's statement about carrying a gun into the ghetto, however, could be construed as based on race. Drawing a reasonable inference in Wilson's favor, Bowen's use of "ghetto" may have been a racially offensive term for predominantly black neighborhoods. And Bowen may have been implying that black neighborhoods, or black people generally, are dangerous.

But even if that's true, this statement wasn't enough to create a racially hostile work environment. *See Boss*, 816 F.3d at 920–21 (collecting cases in which a single racial slur was not sufficient to go to the jury on the plaintiff's racial discrimination hostile-work-environment claim). It was an isolated incident.

Like McNeil's text messages, Bowen's statement wasn't "physically threatening or humiliating" but instead falls on the "mere offensive utterance" side of the line. *Id.* at 921. The

record doesn't show that this statement was even directed at Wilson, so it's less severe. *See Dandy*, 388 F.3d at 271.

Wilson responds with a question, arguing that Alfasigma had a duty to take her complaints about Bowen seriously. "Did Defendant treat her complaint less seriously or decide not to investigate her complaints because she is black or did Defendant decide a black woman who complained about hostile treatment by a white male co-worker was just 'not a good fit' for the company?" *See* Wilson Resp., at 11 (Dckt. No. 160).

Summary judgment isn't the time for open-ended questions. It's the time for evidence. And without evidence that Bowen's comments were sufficiently severe or pervasive, she cannot succeed on her hostile-work-environment claim.

As with the conduct that Douglas experienced, the Court does not condone the insensitive remarks that Wilson experienced. Dropping f-bombs is inappropriate, and so is making a statement with racially offensive overtones. But they are not enough to survive summary judgment. Alfasigma is entitled to summary judgment on Wilson's hostile-work-environment claim under section 1981 (Count III).

## C. Retaliation Under Section 1981 (Count III) and Title VII (Count V)

Wilson next claims that Alfasigma retaliated against her by firing her in November 2018 because she complained about race- and sex-based harassment.

To succeed on a retaliation claim, Wilson needs evidence that she engaged in protected activity under the statutes by complaining about discrimination. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). "[U]nlawful retaliation [under section 1981 and Title VII] occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630

(7th Cir. 2011) (alteration in original) (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)).  "Specifically, [the plaintiff] must show that he took some step in opposition to a form of discrimination that the statute prohibits."  *Id.* at 631.

Informal complaints will do.  *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).  However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (quotation marks omitted).  Complaining about a coworker's "abrasive" style or conduct isn't enough either.  *Id.*

The evidence doesn't show that any of Wilson's complaints to Alfasigma opposed discrimination – either sex-based or race-based.

Start with Wilson's complaints about Bowen's swearing.  She complained to Oliver that Bowen swore at her when asking for directions in 2016.  *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 51–52 (Dckt. No. 158).  And she complained about Bowen's conduct at the podiatry conference in 2018.  Wilson showed up to the conference 20 minutes late, and Bowen asked her "where the [f-word] were you?"  *Id.* at ¶ 54.  Wilson told Bowen she didn't appreciate being talked to like that and "that was the end of it."  *Id.*  Wilson complained to Alfasigma's HR department about this conduct.  *Id.* at ¶¶ 57–58.

Bowen also hung-up on Wilson on one occasion, and she complained about this conduct, too.  *Id.* at ¶ 59.

But as discussed in considering Wilson's hostile-work-environment claim, Bowen's conduct was rude, but not linked to Wilson's sex or race.  So, in complaining to HR about Bowen's behavior, Wilson never complained about discrimination under either section 1981 or

Title VII.  The statutes don't prohibit the single use of the f-word, or a brusque phone call, so in complaining to HR Wilson wasn't engaging in protected activity.  *See Brooks*, 39 F.4th at 432, 441.  No reasonable jury could find that Wilson was fired for complaining about Bowen's conduct.

Next, Wilson mentions Bowen's statement that he carried a gun when going into the ghetto.  As discussed, this comment could be construed as racially offensive.  But Wilson admits that she *never complained* to Alfasigma about this comment.  *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 60 (Dckt. No. 158) ("Wilson never testified that she made any complaint to Alfasigma's Human Resources department about these alleged statements.").  So, by Wilson's own admission, she never engaged in protected activity by complaining about race discrimination.  And that means that no reasonable jury could find that Wilson was fired based on a complaint that she never made.

Finally, Wilson says that she was retaliated against for asking Oliver questions about her compensation and promotion potential in 2018.  Specifically, Wilson testified at her deposition that (1) she spoke with Oliver about not receiving a raise in 2017 (based on 2016 performance), (2) asked Oliver about her coworker's salaries, (3) complained to Oliver about not being promoted to the district manager position in 2018, and (4) discussed transferring to a different district in 2018.  *Id.* at ¶¶ 28–34, 65–68.

Once again, none of these discussions are protected activity under section 1981 or Title VII.  For example, Wilson testified that when she discussed not being promoted with Oliver, the two had "a heartfelt phone call."  *See* Wilson Dep., at 133:16-23 (Dckt. No. 144-3, at 42 of 155).  Wilson never testified that she complained about not being promoted because she is a woman or because she is black.

The same is true of Wilson's discussion about transferring to a different district. She spoke with an Alfasigma employee asking "to know what the protocol was . . . to be transferred maybe in a different district." *Id.* at 134:1-2. Again, there's no mention of a race- or sex-based discrimination complaint.

Wilson's discussion with Oliver about not receiving a raise in 2017 also didn't include a discussion of discrimination. Instead, Wilson didn't receive a raise in 2017 after a series of policy violations in 2016. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 28 (Dckt. No. 158). Wilson received a final written warning for this conduct. *Id.* at ¶¶ 29–30. So, the discussion about pay didn't constitute a complaint about discrimination, of any kind. *See Skiba*, 884 F.3d at 718.

Despite alleging that she complained of sex and race discrimination, Wilson has not presented any evidence showing that she did so. *See* 6/17/21 Mem. Opin. & Order, at 11 (Dckt. No. 86). Alfasigma is therefore entitled to summary judgment on Wilson's retaliation claims under section 1981 (Count IV) and Title VII (Count V).

### D. Discriminatory Bonuses Under the Equal Pay Act (Count I), Section 1981 (Count III), and Title VII (Count V)

Finally, Wilson claims that Alfasigma discriminated against her on the basis of her sex (Counts I and V) and race (Counts III and V) when it paid her bonuses. Douglas brings her sex-based claims under the Equal Pay Act and Title VII, and her race-based claims under section 1981 and Title VII.

The Court relies on the legal standards already laid out for claims under the Equal Pay Act and section 1981. And as mentioned, Title VII claims are analyzed under the same standard as section 1981 claims. *See Brown*, 700 F.3d at 1104 n.1.

Here, the Court denies Alfasigma's motion for summary judgment, except as to Wilson's claim under Title VII alleging discriminatory bonuses paid before March 27, 2018. Those claims are time barred, so Alfasigma is entitled to summary judgment. The remainder of Wilson's claims, however, survive as Wilson has put forth just enough evidence to create a material dispute about how her sales territories – and therefore her bonuses – were determined.

Wilson argues that her bonuses were lower because "Oliver reassigned high volume and high-income zip codes in the middle of [an] ostensibly exclusive geographic area of contiguous zip codes." *See* Wilson Resp., at 8 (Dckt. No. 160) (quoting Wilson Dep., at 177: 8-18).

Wilson also testified that she did not receive credit for sales to doctors that were in her sales territory. *See* Wilson Dep., at 179:4-7 (Dckt. No. 162-2, at 24 of 56). As a result of this realignment, Wilson claims that she did not receive credit for sales to seven doctors. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 133 (Dckt. No. 158). She claims that McNeil, a white man, was receiving credit for sales to these doctors instead. *See* Wilson Dep., at 179:10-17 (Dckt. No. 162-2, at 24 of 56).

Specifically, Wilson testified that McNeil received credit for sales to Dr. Jabber even though Dr. Jabber was located within her territory. *Id.* at 100:5 – 101:8. She testified that Dr. Jabber spent the majority of his time, "at least three days a week," in her territory. *Id.* at 100:16-20.

Wilson acknowledged that Dr. Jabber's primary office location eventually changed, meaning that he left her sales territory. *Id.* at 100:21 – 101:8. But the record doesn't establish when Dr. Jabber changed his primary office to a location outside of Wilson's sales territory. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 134 (Dckt. No. 158).

So, it's not clear from the record whether Alfasigma followed its policies when assigning credit for Dr. Jabber's sales.

Alfasigma makes much of the fact that sales territories were set fairly by a third-party contractor. *See* Def.'s Mem. in Support of Mtn. for Summ. J. as to Wilson, at 14 (Dckt. No. 143). However, Wilson's deposition testimony indicates that McNeil, a white male coworker, received credit for certain sales that she should have been receiving credit for. She also testified that Oliver, as district manager, was able to adjust sales territory boundaries. *See* Wilson Dep., at 129:10-16 (Dckt. No. 144-3, at 38 of 155).

And it is undisputed that quarterly bonuses were based, at least in part, on sales volume. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 103 (Dckt. No. 158).

So, there is a disputed question of fact about whether Dr. Jabber was in Wilson's sales territory, and whether Wilson received bonus credit for his sales. Wilson testified that the bonus credit was instead assigned to McNeil, a white man. That testimony raises a question of fact about whether similarly situated male and white employees were treated differently in assigning doctors to sales territories.

Circumstantial evidence of discrimination can include evidence that other similarly situated employees were treated differently. *See Skiba*, 884 F.3d at 723. Wilson has raised a question of fact about whether McNeil was treated differently than her on account of her sex or race.

Alfasigma contends that certain doctors were removed from Wilson's territory when she became a dedicated sales representative for a particular product, VSL#3. *See* Def.'s Mem. in Support of Mtn. for Summ. J. as to Wilson, at 15, 17 (Dckt. No. 143). It argues that after Wilson

changed roles, "the entire zip codes containing those doctors' locations were transferred out of her territory, or she was no longer responsible for calling on the doctors." *Id.* at 17.

But even if this is true, Wilson testified that she became a dedicated sales representative in the fourth quarter of 2018, just before she was fired. *See* Wilson Dep., at 103:23 – 104:14 (Dckt. No. 144-3, at 18–19 of 155). However, Wilson testified that McNeil was getting credit for her sales in 2017 and 2018. *Id.* at 178:22 – 179:7. That is, she testified that McNeil was receiving credit for her sales before Wilson's sales territory was altered when she became a dedicated sales representative in late 2018. So, Alfasigma's argument is not enough to show that Wilson's asserted loss of sales to a white male colleague was due to her transfer to a different sales position.

However, Alfasigma is entitled to summary judgment on Wilson's Title VII claim for bonuses that were paid before March 27, 2018.

Under Title VII, a plaintiff must file a charge with the Equal Employment Opportunity Commission ("EEOC") before filing suit in federal court. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1846 (2019). The complainant "has 300 days from the alleged discriminatory or retaliatory act to file a timely charge of discrimination with the EEOC." *See Chatman v. Bd. of Educ.*, 5 F.4th 738, 744 (7th Cir. 2021).

Failure to file a timely EEOC charge is an affirmative defense to a later filed lawsuit. *Chatman*, 5 F.4th at 744. "At summary judgment, a defendant who asserts this affirmative defense must show that there is no genuine dispute of material fact as to whether the plaintiff timely filed with the EEOC." *Id.* The defendant can make this showing "by pointing to evidence that affirmatively shows that the plaintiff failed to timely file." *Id.*

Here, it is undisputed that Wilson filed her charge with the EEOC on January 21, 2019. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 77 (Dckt. No. 158).

Looking backward 300 days, Wilson could complain about discriminatory bonuses under Title VII that occurred on or after March 27, 2018. So March 27, 2018 is the dividing line. Any conduct before March 27, 2018 took place more than 300 days before Wilson went to the EEOC. Wilson cannot bring claims based on discriminatory bonus payments under Title VII before that date.

In sum, the Court denies Alfasigma's motion for summary judgment on Wilson's discriminatory bonus claims under the Equal Pay Act, section 1981, and Title VII, except for claims under Title VII based on bonus payments before March 27, 2018. Those claims are time barred.

## Conclusion

For the foregoing reasons, Defendant's motion for partial summary judgment against Douglas (Dckt. No. 140) is granted in full. Defendant's motion for partial summary judgment against Wilson (Dckt. No. 142) is granted in part and denied in part.

Date:   December 30, 2022

Steven C. Seeger
United States District Judge

46